UNITED STATES v. 6.87 ACRES OF LAND IN VILLAGE OF GARDEN CITY, NASSAU COUNTY, et al.

C. P. No. 7.

District Court, E. D. New York.

Oct. 14, 1943.

Harry T. Dolan, Sp. Asst. to Atty. Gen. (Edward H. Murphy, Sp. Atty., Department of Justice, of Brooklyn, N. Y., of counsel), for petitioner-plaintiff.

Skinner & Bermant, of New York City (Jacob W. Bermant, Bernard L. Bermant, and George Bergen, all of New York City, of counsel), for claimant Warehouse Building Corporation.

Griggs, Baldwin & Baldwin, of New York City (Philip S. Hill and John P. Coffin, both of New York City, of counsel), for claimant-tenant Great Atlantic & Pacific Tea Co.

CAMPBELL, District Judge.

This is a condemnation action.

The issue presented before me on this hearing is the determination of the market value, and the just compensation to be paid for the acquisition of 2.40713 acres of land in the Village of Garden City, County of Nassau, State of New York, upon which there has been erected a three-story brick and concrete warehouse.

The proceeding was instituted by the filing of a petition in condemnation on October 13, 1942, which sought the acquisition of the property in fee simple.

The acquisition of another parcel adjoining the subject property to the north, owned by Atlantic Warehouses, Inc., a subsidiary of The Great Atlantic & Pacific Tea Company, was also sought in this action, but a stipulation of settlement and final order as to that parcel has been heretofore filed herein, and we have no further concern with it.

On the same day, October 13, 1942, an order for immediate possession was duly entered directing that possession of the subject property be delivered to the Petitioner-Plaintiff for the public use.

Thereafter and on December 19, 1942, a declaration of taking was filed and simultaneously a deposit was made as required by Title 40, Section 258a, U.S.C.A., and title was vested in the petitioner-plaintiff.

On the same day, December 19, 1942, an amended notice and petition was filed with the declaration of taking, and on the same day a judgment on the declaration was entered.

On April 26, 1943, a judgment of condemnation was duly entered, and the hearing directed thereby by the Court to judicially determine the fair market value, and just compensation required to be paid for

the taking of said property has been brought on for trial before this Court without a Jury.

I have viewed the property here in question, but such view was after the taking and after a new subdivision of the interior of the building was made.

The subject property at the time of taking was owned by the Warehouse Building Corporation, formerly Chain Store Corporation, by deed from Leslie L. Leveque and wife dated February 20, 1929, who had acquired it from John Breckenridge by deed dated January 22, 1922.

The parcel to the north was conveyed by Breckenridge to the Atlantic Warehouses, Inc., by deed dated November 11, 1929.

Prior to the conveyance to Leveque, and on December 29, 1937, Breckenridge made a lease of the subject property to The Great Atlantic & Pacific Tea Company, together with a right of ingress and egress over a strip 30 feet in width as an outlet to Stewart Avenue. The said lease provided that it should commence on June 1, 1928, and was for the term of ten years and five months, at a yearly rental of $31,000, based upon 73,962 square feet.

Leveque when the conveyance was made to him was to construct a three-story brick and concrete warehouse.

By said lease there was also granted to the Chain Store Company the privilege of two five-year renewals, under the same terms and conditions, upon giving notice.

The whole term, had the renewals been availed of, would not have expired until October 31, 1948.

In and by said lease the lessor agreed, if requested by the lessee, to build an extension not less than 60 feet in length, nor more than 190 feet, and to be the full width and height of the contemplated warehouse. If the said first addition was constructed, the additional rent to be paid to the lessor was to be on a basis of $11\frac{1}{2}\%$ of the cost of the addition, and the original term was to be extended for 10 years from the date the extension was ready for occupancy. The lessee was also given the privilege to call upon the lessor, within a period of 9 years from the date of the lease, to exercise that privilege. It was also provided that if the lessee exercised that privilege the lessee was to have the privilege of two five-year extensions under the same terms and conditions. All outside repairs were to be made by the lessor, inside repairs by

the lessee, and the property returned in as good condition of repair as at the commencement of the term reasonable wear and tear excepted, and any fixtures placed upon the premises by the lessee remained the property of the lessee, and they had the right to remove them upon surrendering the premises.

The original building was constructed, and was occupied by the lessee under the terms of that lease. Thereafter the lessee requested the building of an extension under the terms of the original lease, and a supplemental lease was entered into, dated October 15, 1929, extending the term for 10 years and 10 months so that the original lease as modified and extended, by the supplemental lease, was by its terms to terminate on October 31, 1940. The extension was to be considered part of the demised premises, the original rental of $31,-000 was to be continued, and additional rental of $18,600 was provided for the extension, making a total rental of $49,600. The lessee had until October 15, 1938, to call upon the lessor to construct a second extension and that if a second extension was constructed a further extension of the term of the lease to October 31, 1950, was provided for, with two five-year options to renew which, if exercised, would have caused the lease to terminate on October 31, 1950.

On April 29, 1940, while the lease was in force, which, if the tenant had exercised the options to renew would have extended to 1960, a new lease was entered into, dated June 7, 1940, for a period of only two years, commencing November 1, 1940, and terminating October 31, 1942, at a reduced rental of $44,640 per annum, with the option to the tenant to have three one-year renewals. I have gone into the leases of the subject property at length, because due to conditions with reference to the real estate market at Garden City, for property improved as is the property in question, it seems to me that the fair rental value of the subject property can be clearly established, and furnishes the most potent factor in determining the fair market value of the subject property and just compensation to be awarded for its taking.

There were no sales or leases of comparable property in the immediate vicinity of the subject property, or even in all of the County of Nassau.

There were sales and leases of comparable property, in the Counties of Kings and Queens, at very much lower prices than defendants contend the subject property was worth, on the day of taking, but I have not considered them in arriving at my determination, as I considered them too remote, and further, some of them could be put to a wider use.

In this connection we must not lose sight of the fact that the subject property was located in a zone which permitted its use for business, but not in a zone where manufacturing was permitted.

The buildings were constructed for use by the tenant as a warehouse, and were peculiarly fitted for such use. While the defendant owner is entitled to compensation for any use to which the property could be put, its best use was as a warehouse.

There is no demand at Garden City or even in the County of Nassau as a whole, for such a large warehouse.

The contention was raised by defendants' expert that the building could be subdivided, and parts rented to various tenants, but that would entail a considerable expense, the amount not having been stated, and I am not convinced that there was any demand for parts of that property, and that the contention is based solely on the unsupported opinion of defendants' expert.

Even if the subdivision was made, and tenants were found for the several parts, vacancies and loss of rent would be more likely to occur.

Further, we must consider the fact that the subject property was not on Stewart Avenue, but had ingress and egress from and access from Stewart Avenue through a strip of land 30 feet wide partly paved.

It is also a fact that the parcel of land between the subject property and Stewart Avenue is owned by Atlantic Warehouses, Inc., a subsidiary of The Great Atlantic & Pacific Tea Company, the tenant of the subject property, and has been used by the said Great Atlantic & Pacific Tea Company in ways that were permissible under the zoning regulation, and there is no reason to suppose that such use would be accorded to another tenant.

■ What constitutes just compensation under the Constitution and Laws of the United States, which is what I must award in this case, have been clearly shown in the opinion of the Supreme Court, Mr. Justice Roberts writing for the Court, in United States v. Miller, 317 U.S. 369, 63

S.Ct. 276, 87 L.Ed. ——, and need not be repeated here, but it may be said that fair market value is just compensation.

We are deprived in this case of one of the outstanding methods of ascertaining fair market value, that is, by sales of comparable property in the vicinity as I have hereinbefore pointed out.

The attempt has been made herein by the various experts to show fair market value by showing what in their opinions would have been on the day of taking the cost of reproduction new less depreciation, plus the value of the land. This is not a very satisfactory method, as it leaves too much to opinion and speculation, and in reality it is not what the improvements cost less estimated depreciation that determines their value on the day of taking, but what they added to the value of the land at that time.

There has been given in the instant case, by the experts for plaintiff and defendant, sharply conflicting evidence as to the cost of reconstruction new less depreciation.

On behalf of the defendant it is contended that the cost of reproduction new was $490,162, that is, $4.26 a square foot plus about $12,000 for about 6,000 squares of unenclosed sheds at $2 a square foot.

On behalf of the plaintiff the figures are much lower for the cost of construction, the highest being $336,401.

There are differences in the depreciation figured by the various experts.

On all the evidence I am convinced that $3.25 a square foot, for 114,600 square feet, amounting to $372,450 plus $8,500 for unenclosed sheds makes $380,950 the cost of reproduction new at the date of taking from which must be deducted 18% for depreciation, amounting to $68,571, making the cost of replacement new less depreciation $312,380, but the improvement did not add that much to value of the land.

Defendants' expert's estimate of the value of the land is not supported by any convincing evidence.

The value of the land is $23,070, to which must be added $6,041, the value of the railroad sidings, which must be considered as part of the land, making $29,111 in all.

■ This brings us to a consideration of the rental value of the land, which, under the peculiar circumstances of this action, I consider the best means of determining the fair market value of the subject property.

The estimate of a fair market rental value of $55,000, made by the defendants' expert, is not supported by any evidence other than merely his opinion.

The rental value of the subject property is definitely shown by the fact that by agreement between landlord and tenant, after careful consideration and much argument, which is not of moment, and has not been considered except to show that such annual rent was deliberately fixed at $44,-640, a deduction of about 10% from the former annual rent, and the term of the lease was reduced, over a year before there was anything said about the taking of the subject property by the Government.

| With an annual rental of | | $ 44640.00 |
|---|---|---|
| The following deductions should be made | | |
| Taxes | $5400.00 | |
| War insurance | 450.00 | |
| General insurance | 350.00 | |
| Replacement | 3500.00 | |
| Depreciation | 6670.00 | |
| 5% reserve for taxes (estimated to be very low) Vacancy allowance and contingencies | 2232.00 | 18602.00 |
| leaving | | $ 26038.00 |
| which capitalized at 8% makes the value of land and building | | $325500.00 |
| which is subdivided as follows | | |
| Land | | $ 29111.00 |
| Improvements | | $296389.00 |

■ In estimating the cost of replacements, we must not forget that as a building advances in age a greater outlay is required to make the necessary replacements. Certainly with the property located as it is, near Mitchel Field, war insurance would be carried by any prudent person, who was the owner of the subject property. It was considered that the taxes were low and therefore a reserve should be set up for that, as well as vacancies and contingencies, and the amount estimated I am convinced is a fair estimate.

| I find that the fair market value of the subject property, land and improvements and just compensation for its Taking is and I award therefor....... | | $325500.00 |
|---|---|---|
| subdivided as follows | | |
| Land | $ 29111.00 | |
| Improvements | $296389.00 | |

I have allowed in my award for items installed in the premises which were attached to the freehold, which the tenant did not attempt to remove and which became part of the freehold.

Defendant seeks interest on the award from the date of the Government's taking

598

possession, October 13, 1942, together with the school taxes alleged to have been paid, under protest, while the Government was already in possession.

The award shall carry as a part of it interest thereon at 6% per annum from October 13, 1942, to December 19, 1942. If the claimant should be entitled to any interest from December 19, 1942 (which I do not find), many other questions would arise which can not be determined here.

On October 1, 1942, the school taxes for the half year in the sum of $913.52 became a lien and the Government did not take possession until October 13, 1942, these taxes therefore were a lien when possession was taken, and when the declaration of taking was filed, and their repayment to the claimant by the Government is denied.

The claimant The Great Atlantic & Pacific Tea Company, as provided by the lease, paid its rent in advance for the month commencing October 1, 1942, and ending on October 31, 1942. Possession of the property was taken by the Government on October 13, 1942, and The Great Atlantic & Pacific Tea Company now seeks to be paid out of the award made to the defendant owner, the proportionate part of said rent from the date of the taking of possession by the Government, to the end of the month, stipulated to be $2,160.

The claimant The Great Atlantic & Pacific Tea Company has mistaken its remedy; it is not entitled to the return of any of the rent as such in a condemnation proceeding. Gugel v. Isaacs, 21 App.Div. 503, 48 N.Y.S. 594, affirmed 162 N.Y. 636, 57 N.E. 1111.

The case of Larkin v. Misland, 100 N.Y. 212, 3 N.E. 79, cited on behalf of claimant The Great Atlantic & Pacific Tea Company, is not to the contrary.

The remedy of the claimant The Great Atlantic & Pacific Tea Company was to have made a claim for damages caused by the taking and offered evidence to show the amount of the damages suffered. This, it did not do, and there is no evidence of any damage or the amount thereof suffered by it.

The claim of the claimant The Great Atlantic & Pacific Tea Company, for a return by the defendant owner of a portion of the October rent, is denied and dismissed.

Settle order on notice.