CITY AND COUNTY OF HONOLULU, A MUNICIPAL
CORPORATION *v.* BISHOP TRUST COMPANY,
LTD., AND J. RUSSELL CADES, TRUSTEES
UNDER INDENTURE OF TRUST OF T. A. K.
CLEGHORN; HELEN H. CLEGHORN, SURVIV-
ING WIFE OF PERCY T. CLEGHORN; ELINOR
HEWLETT BROWN; ELIZABETH-LOUISA CLEG-
HORN SMITH; WILLIAM LODGE CLEGHORN;
DOTVIVI CORPORATION, LTD.; ET AL.

No. 4371.

July 9, 1965.

Tsukiyama, C.J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

446

OPINION OF THE COURT BY LEWIS, J.

This is an appeal by plaintiff, hereinafter referred to as the "City," from a judgment in eminent domain proceedings, which in part represented an award of just compensation on the verdict of a jury and in part represented stipulated amounts. The City asserts error affecting the jury's verdict. As to the stipulated amounts, it is contended the judgment should not have included interest thereon.

The action was for the acquisition of property at Waikiki for a public park and beach. On February 21, 1958 the City filed an amended complaint, and this has been accepted by the parties as the valuation date.

For condemnation purposes, the property was described as two separate parcels. It was agreed, however, that the two together constituted one entire tract, extending from

Kalakaua Avenue to high water mark. The property was on the Diamond Head (east) side of the Moana-Surfrider Hotel, next to a public right of way to the beach which ran between the hotel and the subject property.

The smaller of the two parcels, designated Parcel 8-A and containing 1,920 square feet, was the makai (seaward) portion of the tract. It was an unimproved area subject to a Beach Reclamation Agreement under which this piece was subject to an easement for, and was in use as, a public beach. The value of Parcel 8-A was stipulated, and the only point before us as to this parcel is the right to interest on the stipulated value.

The remainder of the tract consisted of 8,597 square feet, designated as Parcel 8. It had a street frontage of 57.54 feet. The other end of the lot abutted on Parcel 8-A, which gave it beach frontage. The beach frontage was 60.83 feet. At the time of the condemnation there was in effect a 1940 lease of this parcel to Dotvivi Corporation, Ltd., hereinafter called "Dotvivi." The lot was improved with a two-story building completed in the latter part of 1941 or early in 1942, occupying approximately 7,000 square feet of the lot. The building was set back from the street about ten feet. There was no parking area.

Before the jury was impaneled, the parties entered into a stipulation in chambers, which was not to be revealed to the jury. It was stipulated that $190,000 was the value of the improvements on Parcel 8. However, the jury was to value Parcel 8 as a whole, and then from the value fixed by the jury's verdict $175,000 (not $190,000) was to be deducted to determine the value of the land. Thereafter, the attorney for Dotvivi announced that he would have a very limited participation in the trial, would put on no evidence, and would not cross-examine. After trial, the jury returned a verdict of $574,400 for Parcel 8.

All of the witnesses agreed that a purchaser would make continued use of the present building, and that the property should be valued accordingly, though one of the witnesses was of the opinion that the building "as it existed" was not the highest and best use of the property. On the valuation date the building was in use as follows: The Diamond Head (east) side of the ground floor was divided into small shops, which were rented. The Ewa (west) side of the ground floor was used by Dotvivi, except for about 750 square feet with frontage on the beach rented for restaurant use. Dotvivi was using its area for the game of Fascination, which subsequently, before this case came to trial, was held an illegal gambling game.[1] On the second floor Dotvivi was operating an eight-lane bowling alley.

At the time of the filing of the original complaint the property was owned in fee simple by members of the Cleghorn family. The property never has been the subject of a sale, having passed by inheritance in a continuous chain of title from the original owner. Prior to the amendment of the complaint, the property was placed in trust, and the trustees and beneficiaries hereinafter are referred to as "defendants," or "Cleghorn defendants." Dotvivi has filed no brief in this court and did not appear upon the argument. Certain tenants intervened as defendants but are not parties to this appeal.[2]

The questions at issue primarily concern the method of presenting expert testimony as to value. Before proceeding to the specifications of error we will review the evidence at some length.

---

[1] *State* v. *Prevo*, 44 Haw. 665, 361 P.2d 1044.

[2] Bishop National Bank and Pacific Insurance Company, named as defendants, have taken no active part in the case, apparently because their claims were satisfied out of the moneys deposited in court and distributed by stipulation.

Contrary to the usual practice[3] defendants put on their evidence first. Their first witness was an officer of Bishop Trust Company, one of two trustees under the aforesaid indenture of trust. He testified that he did not pretend to be a real estate expert but was generally familiar with Waikiki lands. Over objection, he was allowed to give his opinion of the value of the land without the building, on the ground that he could give such opinion as owner. His figure was $500,000 for the land only. We have before us no specification of error as to this testimony.

The second witness for the defendants qualified as an expert. He valued Lot 8, as improved, at $675,000, basing his opinion solely on the capitalization of net income, which he computed by placing a square foot rental value on the useable floor space, allowing for vacancies, and deducting the estimated taxes, expenses, and depreciation. He visualized a restaurant on the second floor, but did not figure on the cost of converting to restaurant use, envisioning that the restaurant operator would make improvements at his own expense. As to the land itself, $500,000 was "roughly my opinion of value of the land" according to this witness. However, after checking "all of the sales and the recent leases in the Waikiki area that could possibly reflect any light on the value of this property" he could find none that he considered comparable.

The third witness for the Cleghorn defendants, another expert, valued Parcel 8, as improved, at $657,000. He also used the income approach. By using depreciated cost for the building he valued it at $163,000, leaving $494,000 as the value of the land. He considered one transaction involving another property, a sublease made July 1, 1958 of a wider and deeper tract. He used this as a check on the value attributed to the land by the income approach,

---

[3] *State* v. *Kapahi Heirs*, 48 Haw. 101, 395 P.2d 932.

but made no valuation by the comparative method. This feature of his work was, he testified, "a last hope to try to get comparability, which is practically impossible."

The City offered only one witness, an expert witness who valued the property, as improved, at $450,000. He was the only witness who used the comparative method. By this method he valued the land at $32 per foot, except for 593 square feet subject to a building setback requirement which he discounted ten per cent. This came to $273,100 for the land. By the depreciated replacement cost method he valued the building at $178,000. By the income approach the building value came to $166,600, in his opinion. Considering both methods, he placed a value of $175,000 on the building. His final figure for the land was $275,000.

In determining the net income to be capitalized, all of the expert witnesses considered rentals for floor space in the Waikiki area in order to estimate the gross income. The City's expert, however, was of the opinion that continuance of the bowling alley was the best use of the second floor, taking into consideration the cost of remodeling for other use. The greatest disparity in estimates of gross income occurred with respect to the second floor, having 5,440 square feet of rentable space and 990 square feet of storage space, according to one of defendants' experts. The first floor had 5,240 square feet of rentable space and 600 square feet of storage space.

It is manifest that the income approach, as used, required determination of the remaining life of the building, in order to compute the depreciation to be taken into account. One of defendants' expert witnesses took 27 years as the remaining life of the building, the other 28 years. The City's expert, on the other hand, was of the opinion that considering economic depreciation and functional

obsolescence[4] the building should be written off in 15 years.

Upon this review of the evidence we turn to consideration of the specifications of error.

## I. ADMISSIBILITY OF ORDINANCE NO. 1561 TO SHOW THE LIMITATIONS AND RESTRICTIONS APPLICABLE TO THE PROPERTY BY REASON OF THE COMMERCIAL ZONING.

Defendants had brought out that the property was "zoned for commercial use," that Waikiki property reflects the volume of tourist dollars spent there, and that: "The only land zoned for commercial use of any great significance is along Kalakaua Avenue and on the little short adjoining streets * * *." However, the City was not permitted to complete the picture by introducing Ordinance No. 1561, offered to show "the limitations and restrictions" applicable to the property by reason of the commercial zoning. This constitutes the subject matter of Specifications of Error Nos. 11 and 12.

---

4 This witness testified:

"A. * * * In other words, what I'm trying to say, in Waikiki at that time there was a great building boom, lots of new structures being built. How does this structure compare with the buildings being built in Waikiki at that time? The structural engineer knows the present day cost and the structural members and the building material defects.

"But then, as far as economic depreciation and functional obsolescence—for instance, this building would have only one toilet on the ground floor. The tenants' floor has no toilet and you have to go upstairs to the mezzanine floor. The bowling alley has no toilet by itself. That kind of arrangement is not a first-class building so you have some kind of functional obsolescence.

*      *      *      *      *

"A. The interior is a patch job which is not the building that was originally built and had been carried out through until the day we saw it, but it was remodelled in 1954 or 1955. I have notes on the dates.

"For instance, the downstairs portion where they have the arcade portion, they have ten stores. Those are more or less cubicles—small things about 100 square feet or two hundred square feet cubbyholes or portions of the area going from Kalakaua Avenue to the beach. And it is partitioned off by different kinds of wood—not the original material. And some ceilings are eight feet; some are twelve feet and to give the same uniform height, they put wire nettings over them. So they tried to adjust the condition to keep the tenants."

The trial judge, in sustaining defendants' objection to the introduction of the ordinance, reasoned that:

> "* * * It [the property] certainly has a possibility of a resort hotel use, but Mr. DeVault and Mr. Collins [defendants' experts] testified to value predicated on the present building. Neither one testified that the highest and best use was to tear the building down and build a hotel."

The record does not bear out the proposition that the provisions of the ordinance were of no significance in the case because defendants' experts "testified to value predicated on the present building."

An issue of great importance was the effect of the beach frontage on the value of the property. Defendants not only brought out the limited amount of Waikiki property zoned for commercial use but also the small area in the business district with frontage both on Kalakaua Avenue and the beach. Speaking of this situation, one of defendants' witnesses testified that "the golden area of Waikiki lies within this small scope." It was because of the beach frontage that the subject property was deemed so unique that the comparative method could not be used, according to defendants' experts.

The existing building as presently in use took little advantage of the beach frontage. As seen, there was a small restaurant on the first floor opening onto the beach consisting of only 750 square feet. Defendants did not show that this space commanded a better rental than the remainder of the first floor; some of the evidence offered by defendants was to the contrary, indicating that for business uses the street frontage afforded the higher rental on the first floor. We deduce that the beach frontage enhanced the income potential of this 750 square foot area over what it would have been for an area in the rear having no beach frontage. But considering the small area in-

volved, this hardly justified the emphasis put by both of defendants' experts on the unique character of the property. The possibility of taking greater advantage of the beach frontage was bound to occur to the jury. This possibility definitely was brought into the case by defendants' first expert, Mr. DeVault, when he envisioned a restaurant on the second floor. It is noteworthy, as showing defendants' theory of the case, that the jury was instructed at defendants' request to find the price the property would have brought at the time of taking, assuming a buyer and seller "fully informed on that date as to all circumstances favorable and unfavorable with respect to the property, and as to all uses to which the property was then being put, and as to the highest and best use and all other uses for which the property was at that time actually and potentially suitable and adaptable." The jury further was instructed, at defendants' request, to make their determination "in the light of all facts affecting value as shown by the evidence together with any facts which, although not shown by the evidence, are of such general knowledge as not to require proof."

More was involved than the question of conversion of the second floor to restaurant use. Defendants' experts, in relying as they did on the income approach and rejecting the comparative approach, necessarily assumed that when the time came to rebuild, another facility as good or better could be built and amortized out of income and return a sum justifying the value attributed by them to the land. A purchaser would take a long-range view, as well as looking to the immediate future. Defendants' first expert recognized this when he testified as to the flexibility of the property:

"The property is zoned for commercial use and is right in the heart of Waikiki's commercial center. Commercial zoning will also permit hotel use, so it has

the flexibility of almost free usage in respect to commercial or hotel use."

And again:

"* * * Although I don't consider the building as it existed as being the highest and best use of the property, yet its income was enough to give a purchaser a great amount of flexibility in continuing to operate the building as it was. He could make certain improvements to the building—change its use to some extent and continue to operate this building. He even had the flexibility of—in some future day when the time was most favorable to do so, depending on construction costs, interest rates, et cetera—that he could tear down this building and put up a high-rise building if he so desired. It had this flexibility at the time it was taken."

The court's ruling excluding the ordinance did not accord the City an opportunity to make a proper showing as to the limitations and restrictions which a rebuilding program on a lot of this size and shape would encounter. The City was entitled to show this. *Cf., City of Beverly Hills* v. *Anger,* 127 Cal. App. 223, 15 P.2d 867; *United States* v. *50.8 Acres of Land,* 149 F. Supp. 749, 752 (E.D. N.Y.); *City of Tyler* v. *Ginn,* 225 S.W.2d 997 (Tex. App.). Though the City itself had enacted the ordinance that would not detract from its admissibility, if it was a zoning ordinance validly adopted under the police power. *City of Beverly Hills* v. *Anger, supra.*

However, the ordinance was not marked for identification and is not before us. The only offer of proof was: "It is our position—Your Honor may want to examine the ordinance—that all the witnesses have testified that this is commercial zoning. It is commercial zoning pursuant to this zoning ordinance, but that all the limitations

and restrictions for business zoning are also applicable to the property." The necessity and requisites of an offer of proof are considered below in connection with Specification of Error No. 4. It is sufficient to note at this point that, since the ordinance is not before us and we are not able to scrutinize its provisions to determine their importance,[5] we likewise cannot determine whether the error in excluding the ordinance was truly prejudicial. *Cf., Andrews* v. *Olin Mathieson Chemical Corp.,* 334 F.2d 422, 431 (8th Cir.). As stated in *Sorrels* v. *Alexander,* 142 F.2d 769, 770 (D.C. Cir.), where a similar problem arose:

"* * * We think this was clearly wrong, but this of itself is not enough. A reversal on this ground would be proper only if it is shown that the exclusion was harmful. * * *"

Accordingly, we do not find reversible error on this point.

## II. ADMISSIBILITY, ON DIRECT EXAMINATION OF THE CITY'S EXPERT, OF TESTIMONY AS TO RENTAL PAYMENTS UNDER LEASES OF OTHER PROPERTIES, CONSIDERED BY HIM IN APPLYING THE COMPARATIVE METHOD.

As seen, the City's expert was the only one using the

---

[5] In connection with another point it is noteworthy that some intimation of the restrictions applicable to the property, particularly in respect of provision for off-street parking, did get into the record. The City's expert testified without objection:

"Now, on the unfavorable side, there was traffic congestion * * *. And the government was imposing more rigid parking limitations. That is, when you have to build, you have to offset 40 per cent for offstreet parking sites in order to do business, and apartments, you have to provide so many parking stalls. In other words, there was limitation on use. Then the government made all these controls and regulations, and so business establishments in the use of land were affected.

"There was a strong influence exercised by the big hotels like Matson Hotel or Hawaiian Village, that came into the picture, on the small property owner who had a small piece of land. You cannot develop a resort hotel, a big hotel, to compete with them because of construction costs and limitation of parking and so on. * * *"

comparative method. This witness testified concerning a market data study of sales and leases in the Waikiki area between the Ala Wai Canal and the sea, extending to Coconut Avenue at the foot of Diamond Head. He testified that some transactions were eliminated as too dissimilar, involving for example apartment house sites and lots different in size; also that sales and leases deemed too remote in time were eliminated. After final selection of "some which would show very close resemblance or similarity or comparability with the subject property as of the value date," there was obtained from the public records the rental paid, in the case of a lease, and the amount paid for the land, in the case of a sale. The witness considered this information in arriving at his opinion of value of the subject property.

After considerable discussion concerning the relevancy of the lease of the subject property itself, hereinafter referred to in connection with Specifications of Error Nos. 1, 2, and 3, the City's expert testified he had considered a transaction involving a property on the same side of Kalakaua Avenue as the subject property, about 1,500 feet toward town. The site subsequently was marked on a map, which the witness had prepared, and evidently was a parcel on which the McInerney Building is partly located, opposite Seaside Avenue. After the witness indicated the location of the property the following ensued:

"Q. What type of transaction was this?

"A. This was a lease made—

"MR. CADES: Just a minute. If Your Honor please, it has been ruled in this jurisdiction that a lease of another property is not pertinent. It can never be testified to. The Supreme Court of the United States in the McCandless case said just that. * * *"

There was a conference in chambers on the point, which is unreported except for the court's ruling, as follows:

"THE COURT: Objection sustained. It seems to me we're just proliferating issues and confusing the jury and we will have the jury not valuing just one piece of land but several."

Specification of Error No. 4 contends that the court erred in sustaining the objection. It is apparent that the court only ruled out testimony of the terms of the leases considered by the witness, such as rental payments called for by such leases. Under the court's ruling, as will appear, the witness was allowed to list the leases he considered, as well as the sales, identified by date and parcel number. Defendants concede in this court that it would have been error to have excluded this general testimony.[6] Their objection was made under the *McCandless* case, *McCandless* v. *United States,* 74 F.2d 596, 602-03 (9th Cir. 1935), *affirmed on this point,* 298 U.S. 342, 348, which concerned "evidence of the rental value of other lands in the vicinity * * *." (74 F.2d at 603.)

Upon return to the courtroom after the conference in chambers, the court announced that the objection was sustained. Thereupon, without further objection, evidence was adduced that the witness had considered the lease to which the witness had referred before the conference in chambers, which was dated July 1, 1957. Furthermore, it was brought out that the witness considered a lease made April 2, 1957, of two parcels, one fronting on Beach Walk Avenue near the Kalakaua Avenue intersection, and the

[6] Defendants argue in their brief that "the trial court properly permitted the Appellant's witness to testify that he considered five leases and sales within the Waikiki area which contributed to the witness's opinion * * *," citing *Atlantic Coast Line R.R.* v. *United States,* 132 F.2d 959 (5th Cir.).

They further contend: "The inadmissibility in Hawaiian courts of evidence of the rental value of leases by an expert witness in testifying as to fair market fee simple value in a condemnation proceeding was established by the Ninth Circuit Court and affirmed by the United States Supreme Court in *McCandless* v. *United States,* 74 F.2d 596, 603 (CCA 9th 1935)."

other, partially connecting with the first of the two parcels in the rear, having frontage on Saratoga Road; a lease dated July 31, 1956 of the mauka Diamond Head corner of Kalakaua Avenue and Lewers Road; a lease dated December 20, 1955 covering the lot next to this corner; and a sale made December 23, 1955, of a lot on the mauka side of Kalakaua Avenue, Diamond Head of Kaiulani Avenue, next to the corner lot. All of these sites were marked on the map which the witness had prepared, and which had been marked for identification. In addition the witness marked on the map, as transactions occurring after the valuation date which were considered by him in order to check on the appraisal originally made by him on October 31, 1957, a lease made March 11, 1959 of a long narrow piece of property, running from Kalia Road to the sea, known as the Y.W.C.A. property; and a sale made July 31, 1959, of the mauka Diamond Head corner of Kalakaua and Seaside Avenues. These, the witness testified, "confirmed or supported my original opinion of value." The witness' opinion that $32 per foot was the value of the subject property represented, he testified, a "higher value rate" than that shown by the properties with which he made comparison. This was because, after considering many factors, both favorable and unfavorable, he concluded that "you have a plus sign," "a better picture," "a better margin," for the subject property.

Defendants contend that Specification of Error No. 4, relating to the aforesaid objection taken under the *McCandless* case, is fatally defective. It is their contention that: "In the absence of an offer of proof or other showing as to substance of the testimony required under Rule 3(b) (4), this Court has no basis for review."

Rule 3(b) (4) of this court requires that the specification set out "the full substance of the evidence * * * rejected." According to Specification 4 the question sought

to have the witness "described [*sic*] a lease transaction which involved a parcel of land (portion of T.M.K. 2-6-02-05) located within the neighborhood of the subject property." While the question was simply "What type of transaction was this?" the answer started to go into details, at which point the objection under the *McCandless* case was interposed. It is evident that the parties and the court all understood that what was excluded was any detailed description of the transaction.

Under H.R.C.P., Rule 43(c), an offer of proof was not necessary "if the nature of the error is otherwise clear." *Territory* v. *Branco,* 42 Haw. 304, 313; *cf., United States* v. *Lowrie,* 246 F.2d 472 (4th Cir.); *Maguire* v. *Federal Crop Ins. Corp.,* 181 F.2d 320, 321 (5th Cir.). What occurred here is plain. The City's expert witness was limited in his explanation of his use of the comparative method. He was permitted to paint in the background, but was precluded from putting in the picture. If there were doubt on the point, Specification of Error No. 6 would make it clear. This specification attacks the court's further ruling cutting off an explanation by the City's expert as to how the value of a property deemed comparable was developed from the known lease rental when the rate used in fixing the rental was not known, the objection being that it was improper direct examination, *i.e.:* "His own subjective way of coming to an appraisal on direct examination, aside from a physical description of what he's done and what the process is, is improper direct examination." And again: "It will raise collateral issues and furnishes nothing."[7] Specifications 4 and 6 will be considered together. These specifications are being considered from the standpoint of the effect of a ruling which prevents an expert,

---

[7] Defendants contend that the specification attacking the sustaining of this objection likewise is defective. For reasons already stated, we do not agree.

using the comparative method, from giving the details of how he arrived at a valuation by that method, when the witnesses for the adverse parties have used the income method and have gone into all the details of how they arrived at a valuation by that method.

We are here dealing with an objection to evidence as to leases of other properties, offered on direct examination by an expert witness in giving the reasons for his opinion. Under the rule laid down by some of the cases, direct examination can proceed no further than a statement that sales or leases[8] of similar property were considered by the expert. Evidence of the details of the transactions so considered, particularly the sales price or lease rental, is held to be inadmissible on direct examination. This rule is based on expedience, as explained in *People* v. *Cava,* 314 P.2d 45, 47 (Cal. App.), following *County of Los Angeles* v. *Faus,* 48 Cal. 2d 672, 676-80, 312 P.2d 680, 683-85, which overruled earlier California cases establishing the rule of expedience above stated. In *People* v. *Cava,* the court stated:

"The rationale of the former exclusionary rule was that '* * * to allow evidence of particular transactions to be presented on direct examination would open up each transaction as a side issue and the investigation would be rendered interminable.' *People* v. *La Macchia, supra,* 41 Cal.2d at page 745, 264 P.2d at page 20. Thus, it was simply the apprehension of involvement in a multitude of collateral issues that prompted the adoption of the former rule of exclusion. Exclusion was based on expedience, not on irrelevance. So, even

---

[8] While it is leases of other properties which are involved in the present case, as noted in *State* v. *Kapahi Heirs, supra,* 48 Haw. 101, 111, 395 P.2d 932, 938, sales and leases fall into the same category. Accordingly, authorities involving sales will be considered, as well as those involving lease transactions. The latter will be given separate consideration *infra* in connection with the *McCandless* case upon which defendants' objection was based.

under the former rule a witness was allowed to state on direct examination that his opinion of value was based on sales of similar property, * * *. * * * It was only evidence of the details of the transaction, particularly the price, that was held to be inadmissible on direct examination. * * *"

Coupled with the policy question as to the proliferation of the issues is the question whether the giving by the expert witness of details of the transactions considered by him is objectionable as hearsay. We have concluded that the hearsay rule is inapplicable, since such evidence constitutes only the basis of the expert's opinion, not independent evidence of the transactions considered.[9] Authorities will be found in an annotation in 95 A.L.R.2d 1217, §§ 3, 4 and 5. We deem the matter one lying within the discretion of the trial judge. *United States* v. *5139.5 Acres of Land,* 200 F.2d 659, 661-62 (4th Cir.), is a leading case in which the court said:

"One of the witnesses for the government who had testified as an expert was asked as to sales of similar lands in the community near the time of the condemnation which he had taken into consideration in arriving at his estimate of value. He proposed to testify as to a number of sales which he had learned of in his investigation and which he had verified by examination of the land records in the county. This testimony was excluded because the records were not produced or the

---

[9] The applicability of the hearsay rule when independent evidence is offered, and the inapplicability of the hearsay rule when a witness is testifying as an expert and giving the basis of his opinion, is very well developed in *Weymouth* v. *Colorado Interstate Gas Co.,* 217 F. Supp. 204 (N.D. Tex.).

In this connection we note that Exhibits K-N, consisting of generally available economic and other data, considered by defendants' experts in arriving at an opinion as to value, did not constitute independent evidence and, as contended by Specifications 14-17, such data should not have been admitted in evidence. By reason of the conclusions reached on other points, we need not consider whether the objections to these exhibits were waived.

persons who had participated in the sales called as witnesses. This, we think, was error. While the admission of testimony of this sort was a matter very largely within the sound discretion of the trial judge, the exclusion here rested, not upon a sound exercise of that discretion, but upon an erroneous application of the hearsay and best evidence rules. * * *"

The court said further:

"* * * And, although there is some conflict in the decisions, we think the better rule is that where the opinion of an expert witness is based in part on such sales, he should be permitted to give the details of the sales upon which he bases the opinion, although the facts so stated do not become independent evidence. * * *"

Following this case, the Court of Appeals for the Ninth Circuit stated in *United States* v. *Johnson*, 285 F.2d 35, 40-41 (9th Cir.):

"In the determination of the fair market value of property taken in a condemnation case, evidence of the price for which similar property has been sold in the vicinity may be admissible upon two separate theories and for two distinct purposes. First, such evidence may be admissible as substantive proof of the value of the condemned property, or secondly it may be admissible, not as direct evidence of the value of the property under consideration, but in support of, and as background for, the opinion testified to by an expert as to the value of the property taken.

\*         \*         \*         \*         \*

"Quite obviously when evidence of the price for which similar property has been sold is offered as substantive proof of the value of the property under consideration, a foundation should be laid showing that the other property was sufficiently near that in ques-

tion, and that it was sufficiently like the property in question as to character, situation, usability and improvements to make it clear that the two tracts were comparable in value. However, where evidence of sales of similar property is offered not as substantive proof of value, but merely in support of, and as background for, the opinion of an expert as to the value of the land in question, the requirement of such foundation is not so strict. * * *''

In *State* v. *Parker,* 225 Or. 143, 357 P.2d 548, the question here involved was thoroughly examined and the judgment reversed for failure to permit the State's witness to inform the jury on direct examination concerning the recent sale of three properties claimed to be comparable. It was held that the trial court erred in relegating such testimony to cross-examination. In *State* v. *Peek,* 1 Utah 2d 263, 273, 265 P.2d 630, 637, the court likewise reversed because of exclusion of evidence as to the price paid for similar lands, but recognized the problem of proliferation of the issues, stating:

"* * * It is also within the sound discretion of the trial judge to limit the amount of such evidence in the interest of avoiding confusion of the issues and the undue consumption of time."

We recognize that there is conflict in the decisions. Authorities *contra* will be found in the cited annotation, 95 A.L.R.2d 1217, § 2; they do not represent the modern trend. In 5 Nichols, *Eminent Domain,* § 18.45(1) at 269, note 6 (3d ed.), cases are cited for the proposition that a witness may not fortify his opinion by stating as reasons matters which he could not give in evidence as independent facts because his knowledge of these facts is based on hearsay,[10] but at section 21.3(1), pp. 431-32, note 10, the

---

[10] See, for example, *City and County of Denver* v. *Quick,* 108 Colo. 111, 113 P.2d 999; *State Highway Dept.* v. *Wilkes,* 106 Ga. App. 634, 127 S.E.2d 715.

author recognizes that there is a contrary view under which the hearsay objection applies only when other transactions are admitted as independent evidence of value, citing *Stewart* v. *Commonwealth*, 337 S.W.2d 880 (Ky.), to which we will have occasion to refer *infra*, and citing in the supplement *United States* v. *18.46 Acres of Land*, 312 F.2d 287 (2d Cir.).

Defendants center their arguments in the lease rental feature. They contend that a witness may never fortify his opinion by stating lease rentals of other properties considered by him. The rule contended for is unduly restrictive. It fails to take into account the general rule that: "Any competent evidence of matters, not merely speculative, which would be considered by a prospective vendor or purchaser or which tend to enhance or depreciate the value of the property taken is admissible." *Territory* v. *Adelmeyer*, 45 Haw. 144, 147-48, 363 P.2d 979, 982.

Defendants strongly rely on *McCandless* v. *United States, supra*, 74 F.2d 596, 602-03 (9th Cir. 1935). The point at issue was not a decisive point in that case; the court determined that the jury did not base its verdict on the inadmissible testimony. All that the Supreme Court said on the point, in reversing on other grounds, was: "We find no reason to differ with the holding of the court below as to the inadmissibility of evidence respecting the rent paid for other lands." *McCandless* v. *United States, supra*, 298 U.S. 342, 348 (1936). The decision did not purport to represent the local law of the Territory of Hawaii, only what was thought at the time was the general rule. We, ourselves, in *State* v. *Kapahi Heirs, supra*, 48 Haw. 101, 112, 395 P.2d 932, 939, laid down the rule that:

> "* * * Where evidence of a comparable sale or lease is offered, the trial judge may, in his discretion, admit or exclude it * * *."

*McCandless,* in stating it to be the rule that "evidence of the rental value of other lands in the vicinity is inadmissible," based this pronouncement on the Illinois case of *Pullman Co.* v. *City of Chicago,* 224 Ill. 248, 79 N.E. 572 (1906), which held that "to show the amount of rents derived from other property in the neighborhood * * * would throw no light upon the value of the land sought to be taken, and would but uselessly incumber the record." In a later Illinois case, *Northwest Park District* v. *Hedenberg,* 267 Ill. 588, 591, 108 N.E. 664, 665 (1915), it was held that: "Evidence as to long-term leases of property in a great city, or as to the rental value of other property similarly situated, may or may not be competent, depending upon the particular facts of the case." *Cf., State* v. *Hudson Circle Service Center, Inc.,* 46 N.J. Super. 125, 134 A.2d 113; *Cook* v. *New York Elevated R.R.,* 144 N.Y. 115, 39 N.E. 2.

Certainly, when one of the potential uses of the subject property is for leasing, its value for that purpose is admissible. Thus in *United States* v. *Waterhouse,* 132 F.2d 699 (9th Cir. 1943), another case originating in the United States District Court for the District of Hawaii, the question at issue was the value of Damon Estate lands, not yet subdivided. After review of the record, which showed that the Damon Estate witnesses considered the ground rents derived from other Damon Estate lands which had been subdivided, the Court affirmed without mention of the *McCandless* case. Indeed, there seems to have been no objection to lease rentals as such. Application of *McCandless* would have eliminated the most pertinent evidence available, unless it should have been excluded because the lands had not yet been subdivided.[11] We note

---

[11] From the latter standpoint we do not necessarily agree with the result reached. *Cf., Hawaii Housing Authority* v. *Rodrigues,* 43 Haw. 195.

this as illustrative of the impracticability of a rule eliminating lease rentals of other properties as a hard and fast rule.

Here it was testified by one of defendants' experts that at the time in question landowners in Waikiki were not willing to sell, but would deal on a leasehold basis. The testimony of the City's expert showed that there was a market for leases. Under these circumstances the ground rent that could be commanded for the land was pertinent in determining the value of the property as a whole, and ground rents of comparable properties could be used for that purpose. Vice versa, ground rents of comparable properties could be used to infer the values of those properties, in order to use such values in arriving at the value of the subject property.

If rental rates could not be ascertained from the rents of other property the income stream from a property under condemnation would have to be computed on the basis of existing rents from that property alone, and the method of capitalizing income could not be used in instances of condemnation of owner-operated premises. While cases can be found supporting the last stated proposition,[12] it

---

[12] *E.g., City of Chicago* v. *Giedraitis*, 14 Ill.2d 45, 150 N.E.2d 577. In *St. Louis, Vandalia & Terre Haute R.R.* v. *Haller*, 82 Ill. 208, it was said that rental value was a consideration when the property was held for rent "but the latter mode would not be a proper criterion where it was not held for that purpose." This was followed in *City of Chicago* v. *Baker*, 86 Fed. 753, 756, which held, in an action for damages against a municipality for closing a street, that reduction in rental value could not be shown when the property was not held for the purpose of rent.

*Greenfield* v. *Philadelphia*, 282 Pa. 344, 127 Atl. 768, was a case in which, in the construction of an office building, conformity to a set-back ordinance was required and the strip of land was appropriated for street widening. The landowner was not permitted to show the market value of office space per square foot in office buildings in the general vicinity, the court noting that the office building was not yet erected, and stating: "There necessarily would be so many factors to be taken into account in determining what the net avails would be to the owner from the rents that the result of any determination reached from testimony as to what the rentals might be would be speculative in the extreme." For a case *contra*, see *United States* v. *25.406 Acres of Land*, 172 F.2d 990 (4th Cir.).

is a strait jacket out of keeping with the general rule that all matters are admissible which a prospective vendor or purchaser would consider. Defendants themselves followed the view that rental value may be based upon or inferred from rentals of similar properties. That is, defendants' experts used the income method for the subject property though it was largely owner-operated. Both of defendants' experts put a rental value on the second floor based on supposititious rental values for uses other than the existing bowling alley use. For ground floor space, they considered rents at the International Market Place and the Kaiulani Shops, as well as the existing rents from the portion of the Dotvivi building which was rented. This of course was permissible.

In 1 Orgel, *Valuation Under Eminent Domain,* § 180 (2d ed.), the author notes that "rental value," defined in the text as "an opinion estimate of the probable annual gross or net rentals of the property," is "nearly always admitted when presented by properly qualified witnesses." The author states further: "Generally speaking, the courts regard rental value as a value based upon or inferred from the rentals of other similar properties in the neighborhood." The author then notes in a footnote the problem presented by *McCandless* and certain other cases. Since *McCandless* cannot be reconciled with the accepted view that rental value may be based upon or inferred from rentals of similar properties, it is not a precedent to be followed. We adhere to the rule laid down in *State* v. *Kapahi Heirs, supra.* Though the point there involved was comparability, we now affirm the principles there stated in this case in which a direct attack is made on the use of lease rentals of other properties under any circumstances. Hence, if the trial court based its ruling on the *McCandless* case and deemed the evidence entirely in-

admissible,[13] this was error requiring a new trial.

We recognize that when testimony is given by an expert as to his use of lease rentals, complicating factors as to the terms of the leases which produced these rentals may be introduced thereby, and the issues proliferated even more than when sales prices are used.[14] Under our view, the whole matter is one for the discretion of the trial judge and no absolute rule can be laid down. That such evidence raises collateral issues, that the expert witness who has used the data in question has only hearsay knowledge, that there is difficulty in bringing home to the jury that these are only matters that were considered by the witness and not independent evidence—all of these are factors to be considered. At the same time it must be recognized that, as stated in *Stewart* v. *Commonwealth, supra,* 337 S.W.2d 880, 885 (Ky.):

> "* * * The value of an appraisal depends very largely on the manner in which it is developed. It is of importance to the court and jury to know how it was made and on what information it was based. * * *"

And as stated in *State* v. *Peek, supra,* 1 Utah 2d 263, 271, 265 P.2d 630, 635:

> "* * * Without this evidence the jury is deprived of a valuable source of information on the value of the property, and are greatly handicapped in evaluating

---

13 It is not clear whether the trial court deemed the evidence entirely inadmissible, or excluded it in the exercise of its discretion. The first hypothesis has been considered in this portion of the opinion, and the second hypothesis is considered *infra.*

14 This was deemed the controlling consideration in *Wenton* v. *Commonwealth,* 335 Mass. 78, 83, 138 N.E.2d 609, 612, in which the court said: "* * * While rental value of a parcel the market value of which is in issue may be received as some indication of the fair market value of that parcel, * * * the rental value of similar premises, as distinguished from actual sales near in time, is not sufficiently relevant to warrant the extension of the field of controversy and fact finding which is entailed in its admission. * * *"

the weight and credibility which should be given to the opinion evidence."

Where one side fully develops how its expert witnesses made their appraisals, with testimony and charts setting forth every step of the process, including the figures used and the method of capitalization, and the other side is not permitted to do the same, the scales are thrown out of balance. This is precisely what occurred here. True, the City's expert did, in connection with the income approach which he also used, develop charts similar to those of the defendants' experts. But the scales were thrown out of balance because the comparative method was down-graded by the treatment accorded the testimony of the City's expert as to this part of his appraisal.

As seen, the court ruled that the issues would be unduly proliferated. That objection to the evidence fell of its own weight because of the manner in which the defendants had presented their evidence.[15] It was not necessary that the City object to the detailed explanations of the opinions of defendants' experts. Those explanations did no violence to any rule of evidence. Only considerations of expedience were involved.[16] When the City's expert took the stand the manner in which defendants had set the stage had to be considered. *Cf., Steward* v. *Atlantic Refining Co.,* 240 F.2d 715, 719 (3d Cir.). In *Biener* v. *St. Louis Public Serv. Co.,* 160 S.W.2d 780, 785 (Mo. App.), a case in which the evidence was allowed by the trial judge, in affirming the judgment the court pointed out that the evidence in question bore directly upon the issues and was logically rel-

---

[15] Use of the income method, of course, raised many collateral issues. A change in any factor entering into the computation would change the result, perhaps considerably. Every factor was open to question, for example, the allowances made for depreciation, taxes, and expenses.

[16] The City, of course, had no reason to object to the manner in which defendants presented their evidence and indeed could not object if, as appears, the City intended to present its evidence in the same manner.

evant, and that the only rule of exclusion which defendant had invoked was that which forbade excursions into collateral matters. After reviewing the prior evidence the court in *Biener* stated:

> "No precise and universal test is furnished by the decisions to determine this question, but the question must be determined in each case according to the teachings of reason and judicial experience, taking into account the character of the evidence, the issues in the case, the prior testimony, and last but not least, those considerations of fairness which should accord to the parties equal range in matters of this kind, if possible. * * *"

Here the City was not accorded "equal range." Though the extent to which an expert witness should be permitted to give the details of the transactions he considered on direct examination is within the discretion of the trial judge and all the circumstances must be considered, an abuse of discretion occurred here if the matter was approached in that light.

The comparative method serves a valuable purpose.[17] As has been well stated, "rental income is not to be taken as the sole test of value, but is only one of many elements to be taken into consideration." *Kaperonis* v. *Iowa State Highway Comm'n*, 251 Iowa 415, 417, 100 N.W.2d 901, 903.[18] The income method, as used by defendants' experts, was speculative because the second floor had never been rented. This was a very controversial point. Defendants' second expert checked his computation against the income statement of Dotvivi representing the building as a whole,

---

[17] "* * * [T]he best guide is evidence of sales of similar or comparable properties in the vicinity." *State* v. *Sauls*, 234 La. 241, 254, 99 So.2d 97, 101-02.

[18] *Accord, Kaperonis* v. *Iowa State Highway Comm'n*, 251 Iowa 39, 99 N.W.2d 284; *Frankfurt* v. *Texas Turnpike Authority*, 311 S.W.2d 261 (Tex. Civ. App.) ; *State* v. *Sauls, supra*, 234 La. 241, 99 So. 2d 97, 102.

including the owner-operated portions, *i.e.*, the bowling alley and the game of Fascination. Apparently neither party paid any attention to the fact that, as had been held by this court before the trial, the game of Fascination was illegal.[19] We take note of this as illustrative of the unsatisfactory nature of the income approach.

The defendants presented their evidence on the theory, which was the opinion expressed by their experts, that there were no comparable transactions. It is argued here that the properties involved in the lease transactions identified by the City's expert were not comparable properties. This was not the objection made in the trial court. Moreover, the better view is that, in exercising discretion as to comparability, the trial court, within reasonable limits, should give rein to the views of the expert witness on the stand, who has found the properties sufficiently comparable, and should leave to cross-examination the points of dissimilarity, which of course will affect the weight of the opinion. *United States* v. *Lowrie, supra,* 246 F.2d 472, 474 (4th Cir.) ; *United States* v. *Johnson, supra,* 285 F.2d 35, 41 (9th Cir.) ; *United States* v. *18.46 Acres of Land, supra,* 312 F.2d 287, 288-89 (2d Cir.) ; *Hays* v. *State,* 342 S.W.2d 167, 174 (Tex.). Here the chief point of dissimilarity seems to be that the properties considered by the City's expert had no beach frontage. But it was not a satisfactory solution to the problem of value of the beach frontage to exclude the details as to the comparative method and overemphasize the capitalization of the estimated income from the present building as would naturally result. The existing building took little advantage of the beach frontage.

The City's expert testified that he had attempted to make an adjustment upward to take into account the

19 See note 1, *supra.*

higher value of the subject property after balancing the plus and minus factors, the latter including the limitations and restrictions imposed by ordinance. The defendants' experts apparently did not take the ordinance into account. Whether the City's expert made a proper adjustment was a matter to be handled by cross-examination or testimony of defendants' experts. The record does not show that the adjustment could not be made at all. It only shows a difference of opinion on the point. It is our conclusion that Specifications 4 and 6 show prejudicial error.

### III. EXHIBITS SENT TO THE JURY ROOM.

Specifications of Error Nos. 18-24 attack the rulings of the court whereby the charts made by defendants' experts explaining how they had computed the net income, had allowed for depreciation, and had capitalized the net income to determine the value of the property, were sent to the jury room over plaintiff's vigorous objection that they only had been marked for identification, and that had they been in evidence the case might have been tried differently. The jury was instructed, also over objection, that charts "admitted in evidence" were competent for the purpose of summarizing the testimony but should be disregarded if they did not reflect the testimony.

As was well stated in *Commonwealth* v. *Clark*, 123 Pa. Super. 277, 291, 187 Atl. 237, 242, quoting from and approving an opinion of the trial court:

"* * * Exhibits which ought to be sent out to the jury room are such that will enable the jury, from a close inspection of the papers, to better determine the facts. Maps, plans, deeds, or instruments alleged to have been altered or forged, are illustrations of the kind of exhibits which a jury should have, *but an exhibit which merely permits the jury to read over*

*again what amounts to oral testimony already given should not be sent out unless there is some impelling reason therefor. \* \* \*"* (Emphasis added.)

In *Hatfield* v. *Cheaney,* 76 Ill. 488, it was succinctly stated:

"\* \* \* The testimony of witnesses in open court should go to the jury orally, and not by means of memoranda."

See also *Grand Forks Bldg. & Dev. Co.* v. *Implement Dealers Mut. Fire Ins. Co.,* 75 N.D. 618, 31 N.W.2d 495.

In the first-cited case (*Commonwealth* v. *Clark*) the rule followed was the Pennsylvania rule that "it is in the discretion of the trial judge as to what papers shall go out with the jury." We will assume, without deciding, that some discretion is possessed by a trial judge as to sending to the jury room summaries[20] of complicated testimony when such summaries have been used at the trial as an aid in following the testimony. But this should not be done when the exhibits have not even been admitted in evidence.[21] *Cf., Kaplan* v. *Mashkin Freight Lines, Inc.,*

---

[20] Here the charts actually were summaries of the figures by which defendants' expert witnesses arrived at their opinions of value using the income approach.

[21] The record shows:
"MR. CADES: Your Honor, during the recess, to save time—and we're trying to adjourn at three—I had the witness, with the help of my able assistant, mark down the summary of what he's about to testify. Is there any objection? He will be testifying—using this board and then identifying it and he is going to testify to this and then—
"THE COURT: Apparently no objection so far.
"MR. IWAI: What is he going to do now?
"MR. CADES: Normally he would have written this out as he testified, but we did this beforehand to save the trouble.
"MR. IWAI: No objection, Your Honor.
"MR. CADES: What we have agreed, Your Honor, because after they—the witnesses, after they testify—and this will be true for the City—they may mark it down. This will not be independent evidence. It's merely a convenient summary of the figures that the witness used. With that understanding—
"Q. Will you go to the board and explain \* \* \*."
    \*        \*        \*        \*        \*
"MR. CADES: If Your Honor please, we have discussed the way to handle exhibits. I think it will go for all. I ask that these papers be marked for identification. It will not be independent evidence, but they will be readily available."

146 Conn. 327, 334-35, 150 A.2d 602, 605-06.

Had defendants' charts been offered in evidence, an objection might have been taken on the ground that they should not go to the jury. A ruling against the objection would have alerted the City's counsel to the dangers of the situation, and as contended by counsel for the City in objecting to the rulings here under consideration, the case then might have been tried differently.[22] The case is not one in which the failure to mark the exhibits in evidence was harmless error and hence to be disregarded under H.R.C.P., Rule 61.

It is contended that the point under consideration has been waived because the City's exhibits that were only marked for identification also were sent to the jury room. Defendants refer to six of the City's exhibits, two of which were unmarked in any way and are not contained in the record on appeal. Of the remainder, two were, respectively, a map and a building layout. These were sent to the jury room when defendants' counsel stated that, if the City wanted them, he had no objection. However, such maps and plans are not in the same category as the charts in question. They do not pose the problem of over-weighting of one particular portion of the oral testimony which is presented by the charts.

The other two City exhibits to which defendants have referred were summaries of testimony of the City's expert as to his appraisal by the income method, and were in the same category as the charts. But it was not at the City's request that these went to the jury. In the course of the

22 "MR. IWAI: Your Honor. when you're trying a case you have certain theories, certain methods. You put your emphasis on certain areas; you don't on certain areas. It depends on how an individual tries a case. You try a case as you go along, according to the way the case is happening.

"In this case, it is my understanding it was only for identification for demonstrative purposes. That's the way I went along. If this is going into evidence I might have gone more into detail. * * *"

argument preceding the ruling on the point at issue, while insisting on sending the charts to the jury room, defendants' counsel conceded that: "If the Court were allowing me to do it and not you, then you would be prejudiced." It cannot be deemed a waiver of the City's objection to the receipt by the jury of such exhibits that they went to the jury room in what defendants' counsel deemed was the best possible light.[23] Accordingly, defendants' contention that "any right to object that Appellant may have had was waived" is not sustained.

It follows from what has been said that the instruction given did not help the situation. It merely emphasized that the jury was being given summaries of particular portions of the oral testimony, which they could use if they found that the summaries did in truth reflect the testimony. The net effect of the proceedings was to concentrate the jury's attention on the charts, and to invite their judgment on the income figures. We conclude that the way the case was submitted to the jury was prejudicial to the City.

## IV. EXAMINATION OF THE CITY'S EXPERT ON THE LEASE OF THE SUBJECT PROPERTY.

Specifications of Error Nos. 1, 2 and 3 concern certain testimony of the City's expert on direct. The witness stated

---

[23] After the rulings which are the subject of the specifications under consideration the court ordered the papers brought in, in order to "particularize the things that have been marked for identification which are going to be left with the jury." The following ensued:

"MR. IWAI: (Referring to certain documents). On that basis, Your Honor, these are not going to be left in.

"THE COURT: Will this mean that none of Mr. Lum's figures will be in?

"MR. CADES: Oh, no. * * *"

Previously, as above noted, defendants' counsel had argued:

"* * * If the Court were allowing me to do it and not you, then you would be prejudiced. * * *"

that among the transactions he considered in arriving at an opinion of value was the lease of the subject property. This lease was dated October 1, 1940. A motion to strike was made by defendants' counsel and allowed for the purpose of hearing the objection. It then was brought out that the lease was amended March 24, 1941. The court deemed this "too remote" and the City's counsel sought to withdraw the question but defendants' counsel stated "I just as soon have it in the record." Thereafter, however, the City's counsel was not permitted to show that the lease was further amended in 1953.

All of the testimony concerning the lease could have been excluded on the ground of remoteness. However, we have here a situation in which defendants' counsel elected to leave in the record testimony that there was a lease of the subject property amended in 1941, and that this had been considered by the witness. If, as was endeavored to be shown, the lease was further amended in 1953, the abbreviated facts that crept into the record were not the whole truth. But the matter is not of great moment in the present case, and since it is not likely to recur on a new trial we will not consider it further.

V. ADMISSIBILITY, ON DIRECT EXAMINATION OF THE CITY'S EXPERT, OF TESTIMONY CONCERNING HIS CHECK ON THE GROSS RECEIPTS OF THE BOWLING ALLEY OPERATION.

Specifications 7, 8 and 9 attack the court's ruling sustaining objections to questions put to the City's expert on direct examination, in connection with his testimony as to the income to be expected from the second floor. As seen, the testimony of the City's expert was to the effect that continuance of the bowling alley was the best use of the second floor, taking into consideration the cost of

remodeling for other use. He testified that $6,900 per year would be a reasonable rent for a bowling alley operation. Upon objection to a question as to whether in the witness' study of the existing bowling alley operation he had occasion to talk to the operators, the court ruled that "the question is really the rental value of the property regardless of any use because even a bowling alley operator, looking for a second story place to have a bowling alley would be renting it on the basis of rentals in the general rental market for that kind of property * * *." Thereafter, the matter came up again, and the court sustained an objection to the witness being asked whether he had considered and taken into account the gross receipts of the bowling alley as operated at the time. He had just testified that responsible national agencies, such as the Institute of Real Estate Brokers, put out national averages showing what percentage of the gross take bowling alleys generally can pay for rent, and that he had applied the percentage to the gross take for the bowling alley and confirmed his estimate. The question objected to on this second occasion therefore was repetitious. The testimony had come in. And since it did come in there is no need to consider whether, on the first occasion when only a general question was asked, the City sufficiently made clear its purpose.

For the guidance of the court below on a new trial, we note that the testimony as it finally came in was admissible. As stated in *St. Louis Housing Authority* v. *Bainter*, 297 S.W.2d 529, 535 (Mo.), where the question was the value of a service station site:

"* * * The evidence offered as to the custom and practice in the business in using the formulas mentioned as a basis for determining the value and the rental value of such stations and the further testimony

as to the gallonage sold on the premises and the value and rental value thereof was properly admitted. The jury was entitled to consider all of such evidence in determining the fair market value of the premises in question. * * *"

In the cited case the parties were in agreement as to the highest and best use of the premises. In the present case the best use of the second floor of the building was hotly disputed. Defendants based their objections on two grounds, first, that "business earnings were not proper evidence," and second, that "the issue here is not what a bowling alley will do." As seen, the first matter does not represent the point at issue; here the City was trying to show rental value by a recognized method. As to the latter matter, we note that the City was entitled to pursue its theory of the case, which was based on the impracticability of remodeling. It was for the jury to decide how valid this point of view was. As stated in *Cook County* v. *Holland,* 3 Ill. 2d 36, 41, 119 N.E.2d 760, 763:

"* * * This argument is apparently based upon the proposition that the petitioner is compelled to assume defendants' theory that the highest and best use of the land sought to be taken is for quarry purposes. It has long been the rule that parties to a condemnation proceeding have the right to adopt their own theory as to the highest and best use of the land taken and each may introduce evidence without being bound by the theory of the other. * * *"

## VI. ADMISSIBILITY OF EVIDENCE AS TO NEW RENT SET UNDER AN EXISTING LEASE CONSIDERED BY THE CITY'S EXPERT.

Specification of Error No. 5 presents the question

whether a new rent set for the period September 1, 1959–August 31, 1969, under an existing lease of a property deemed comparable by the City's expert, could be referred to by him as a matter considered in support of his opinion.

Evidently the lease provided for periodic renegotiation of the rent. In such cases it usually is provided that in the event of failure to agree, the matter will go to arbitration or be determined by some means other than the agreement of the parties. Even if agreement is reached, it may well be in the nature of a compromise to avoid expense and uncertainty, similar to a sale under threat of condemnation. *Cf., Slattery Co.* v. *United States*, 231 F.2d 37, 41 (5th Cir.); *Kansas City* v. *Thomson*, 208 S.W.2d 216 (Mo.); *Bruce* v. *State*, 93 R.I. 466, 176 A.2d 846, 848; 5 Nichols, *Eminent Domain*, § 21.33 (3d ed.); Annot., 118 A.L.R. 869, 893, 85 A.L.R.2d 110, 163. While it may be that such objections can be met in some cases, we see no necessity in this case of embarking on the line of inquiry necessary to determine whether, despite the circumstances, the new rent was sufficiently the result of free bargaining to be admissible. For the reasons stated, the record shows no error in the exclusion of this particular item of evidence.

### VII. ALLOWANCE OF INTEREST ON STIPU-LATED AMOUNTS.

The remand will not affect the stipulation made December 5, 1962, before the jury was impaneled. It is not contended that it should. But the City complains of the allowance of "blight interest"—as it was called in the judgment—on the stipulated amounts. This was allowed from the date when possession was taken, February 26, 1958, to the date of judgment, at the statutory rate of five per cent per annum.[24]

---

[24] R.L.H. 1955, § 8-31, referring to sec. 8-23.

Interest was allowed on the total sum of $601,400, computed by adding to the jury verdict of $574,400 for Parcel 8 and the improvements, the sum of $12,000 for Parcel 8-A, and the sum of $15,000, being the difference between $190,000, the stipulated value of the improvements, and $175,000, which it was stipulated should be deducted from the amount returned by the jury to determine the value of the land. The City objected to the allowance of interest on the $12,000 and $15,000 amounts, on the ground that each was "a compromise value."

Parcel 8-A presents the situation of a stipulated value in lieu of a jury verdict. The stipulation was that "to the verdict that shall be determined by the jury shall be added the sum of $12,000 which by agreement of the parties hereto represents the value of Parcel 8-A * * *." This stipulated value, in the absence of an agreement to the contrary, carries interest the same as if returned by the jury. *Cf., Territory* v. *Honolulu Plantation Co.,* 34 Haw. 859, 871-72; *In re Appropriation of Easement for Highway Purposes,* 112 Ohio App. 269, 176 N.E.2d 155.

In *Hawaii Housing Authority* v. *Rodrigues,* 43 Haw. 414, *affirming* 43 Haw. 195, it was held that when the parties agree on the amount of the value, the court assumes that all elements of value were included in the stipulated value. Similarly, when the parties agree on the amount of compensation to be paid, the court assumes that all elements of compensation have been included, interest among others.[25] *United States* v. *Certain Land in City of St. Louis,* 58 F. Supp. 305 (E.D. Mo.); *United States* v. *71500 Square Feet in Borough of Manhattan,* 69 F. Supp. 810 (S.D.N.Y.); Annot., 36 A.L.R.2d 337, § 48; but see

---

[25] Interest allowed as blight damages is an element of just compensation. *State* v. *Coney,* 45 Haw. 650, 372 P.2d 348. So also by statute, interest from the time of an order for possession until judgment is "part of the just compensation and damages awarded." R.L.H. 1955, § 8-31.

*United States* v. *Baugh,* 149 F.2d 190 (5th Cir.). Here, however, the stipulation as to Parcel 8-A was that the *value* was a certain amount. Interest is not an element of value, though it is an element of compensation. The amount of *compensation* to be paid was not stipulated.

Under the stipulation, the $12,000 figure represents the value of Parcel 8-A on February 21, 1958. This amount was intended to be treated the same as if returned by the jury. Hence, interest which would have applied in the event of a jury verdict of $12,000 for Parcel 8-A likewise applies to the $12,000 agreed value.

We now consider the situation as to the improvements. Because of the stipulation entered into we assume, though the record is not clear on the point,[26] that the improvements were separately owned by Dotvivi. Upon that assumption, R.L.H. 1955, § 8-21, called for separate assessment of the value of the improvements.[27] Pursuant to the stipulation of the parties, made December 5, 1962, the jury was to value Parcel 8 as a whole; then, from the amount of the verdict, $175,000 was to be deducted "to determine the value of [the] land," and $190,000 was to be added back as "the value of the improvements." It further was stipulated in respect of Parcel 8 that the value of the land was not less than $273,100.

It is well settled that improvements affixed to land have only such value as they add to the land. 4 Nichols, *Eminent Domain,* § 13.11, p. 351 (3d ed.) ; *id.,* § 13.11(1), p. 358; 2 Orgel, *Valuation under Eminent Domain,* § 189, p. 7 (2d ed.). For an illustrative case, see *United States* v.

---

[26] The lease is not in evidence, and we are not informed as to the rights of the lessee thereunder in the event of condemnation.

[27] "Sec. 8-21. *Damages assessed, how.* In fixing the compensation or damages to be paid for the condemnation of any property, the value of the property sought to be condemned with all improvements thereon shall be assessed, and if any of the improvements are separately owned, the value thereof shall be separately assessed. * * *"

*6.87 Acres of Land in Village of Garden City,* 52 F. Supp. 594 (E.D.N.Y.) in which the court stated:

> "* * * [I]n reality it is not what the improvements cost less estimated depreciation that determines their value on the day of taking, but what they added to the value of the land at that time."

In the cited case it was determined that the cost of replacement less depreciation was $312,380, "but the improvement did not add that much to value of the land," the final figure for the improvement being fixed at $296,389.

No change in the rule as to the value of improvements has been effected by R.L.H. 1955, § 8-21, *supra.* That section was construed in *Matter of Application of Akana,* 42 Haw. 547, 551, in which the court concluded that certain tenants were "not entitled, as a matter of right, to have the value of their improvements determined in the same trial and by the same jury that determines the value of the reversionary interest * * *." Since the court in *Akana* previously had determined (42 Haw. 415) that the tenants claiming as owners of the improvements had been excluded from the condemnation by proper proceedings, it allowed trial of the condemnation action to proceed notwithstanding the tenants had taken a further appeal.[28]

In *Akana* the court cited *United States* v. *City of New York,* 165 F.2d 526 (2d Cir.), as an example of the separate valuation of tenant owned improvements. In that case the awards for these improvements were approved on the ground that:

> "* * * So far as appears, the Commissioners meant to assess the values which these added to the 'site' values, and they will stand as such. * * *"

Thus nothing in *Akana* affects the application of the rule

---

[28] The appeal subsequently was dismissed by order of the Court of Appeals for the Ninth Circuit, as shown by the mandate in No. 4066.

that improvements affixed to land have only such value as they add to the land. Though the value of the improvements is to be separately assessed when they are separately owned, the sum of the land and improvements cannot exceed the value of the property as a whole.

The stipulation here entered into called for determination by the jury of the value of the land and improvements as a unit "without any allocation thereof between the amount attributable to said land and the amount attributable to said improvements." Evidently there was a dispute between the parties as to the significance of section 8-21 and it was desired to eliminate the matter of separate awards by the jury. In order for this objective to be attained there had to be an agreement in advance as to the apportionment of the lump sum award between the landowners on the one hand, and the owner of the improvements on the other hand. The landowners were willing to relinquish $175,000, but not more. The owner of the improvements, Dotvivi, was willing to take $190,000, but not less. The difference of $15,000 could only come out of the City's pocket, and the City agreed to pay it. Thereafter, Dotvivi assumed a standby role, and whatever proof might have been adduced by Dotvivi as to the value of the improvements was not offered.

Was interest under R.L.H. 1955, § 8-31 inapplicable because under the jury's verdict the property[29] was worth $574,400, not $589,400, and only the $574,400 value was contemplated by the statute in providing for interest? Since the statute provides for interest on the value that the condemnor is required to pay, and since a condemnor cannot be required to pay more than the value of the property as a whole,[30] it at first blush appears that by deduct-

---

[29] We here refer to Parcel 8.

[30] This is true because, as above noted, the sum of the land and the improvements cannot exceed the value of the property as a whole.

ing $175,000 and adding back $190,000, the parties made an arbitrary addition of $15,000 not carrying interest. However, there are two points which in our judgment call for a different result, that is (1) if Dotvivi had put on its proof the award conceivably might have been more than $574,400, and (2) the stipulation was that the judgment would reflect $190,000 as "the value of the improvements." Under these circumstances we think Dotvivi was entitled to assume it would be in the same position as if it had put on proof and obtained an award of $190,000, and the principles heretofore stated as to the $12,000 item apply.

CONCLUSION

After taking into account the stipulation of the parties, made December 5, 1962, it appears that the City has conceded that the minimum amount of judgment is $475,100, i.e., as to Parcel 8, $273,100 for the land and $190,000 for the improvements; and as to Parcel 8-A, $12,000. The City's appeal has brought before the court a dispute as to the application of interest under R.L.H. 1955, § 8-31, on a part of the stipulated amounts, to wit, the $12,000 for Parcel 8-A, and $15,000 out of the $190,000 stipulated for the improvements on Parcel 8. We affirm the allowance of interest on these items.

The City's appeal further has brought before the court a dispute as to the value of Parcel 8 with the improvements. The jury's verdict of $574,400 for Parcel 8, as improved, has resulted in a judgment which includes $399,400 for the land (this figure being $175,000 less than the amount of the verdict, pursuant to the stipulation). The judgment is reversed on account of the exclusion, on direct examination of the City's expert, of testimony as to rental payments under leases of other properties, considered by him in applying the comparative method; and

on account of the sending to the jury room of the charts summarizing the testimony of the experts as to the income method, marked for identification but not admitted in evidence. The rulings of the court gave undue emphasis to the testimony of defendants' experts, while the City's expert was too narrowly restricted. A new trial is ordered as to the value of Parcel 8 with the improvements, such new trial to be conducted in conformity with the stipulation of the parties made December 5, 1962.

Remanded for further proceedings in conformity herewith.

*Richard Y. C. Au,* Deputy Corporation Counsel, City and County of Honolulu (*Stanley Ling,* Corporation Counsel, and *Samuel B. K. Chang,* Deputy Corporation Counsel, with him on the briefs), for plaintiff-appellant.

*J. Russell Cades* (*William M. Swope* with him on the brief, *Smith, Wild, Beebe & Cades* of counsel), for Cleghorn defendants-appellees.