## HONOLULU REDEVELOPMENT AGENCY *v.* PUN GUN.

### No. 4500.

April 7, 1967.

RICHARDSON, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

Condemnor Honolulu Redevelopment Agency, hereinafter referred to as Plaintiff, appeals from a judgment in a condemnation proceeding after a trial by jury which fixed the value of the property to be acquired by the plaintiff.

Mrs. Pun Gun, hereinafter referred to as Defendant, owns a parcel of land located in the plaintiff's Kukui Redevelopment Project area. The irregularly-shaped parcel of land contains about 14,270 square feet and improvements thereon consist of 11 wooden tenement buildings which are very old and do not conform to the building

code. The parcel of land is located off River Street.[1] Two lanes serve it as means of ingress and egress. Vehicular traffic is possible on one lane, however, there is conflicting testimony as to whether the other lane is adequate for vehicular traffic.

Two expert witnesses testified at the trial. There were no other witnesses. Mr. Phillip Won, for the plaintiff, appraised the value of the parcel of land at $57,000 based on $4 per square foot and, under the cost approach, $3000 for the buildings. Mr. Y. T. Lum, for the defendant, appraised the parcel of land at $142,750 based on $10 per square foot and $7,250 for the buildings. The jury returned a verdict of $102,800 for the defendant.

During the trial on direct examination, the defendant offered evidence of sales between the plaintiff and other property owners located near defendant's property. Plaintiff objected to the admission into evidence of a map showing these sales and also moved to strike testimony of such sales. The trial court overruled the objection and denied the motion. These rulings are plaintiff's first and second specifications of error. Plaintiff's third specification of error is discussed, *infra.*

## I.

### A.

Plaintiff's first and second specifications of error essentially raise the question of whether other sales made to a condemnor are admissible in evidence. The weight of authority is that evidence of the sale of a parcel of land subject to condemnation to the proposed condemnor or to another potential condemnor may not be admitted as evidence of the value of land condemned. One reason advanced in support of the rule is that such sales are almost always in the nature of a compromise. A con-

---

[1] The lot is located 80 feet from River Street and is described as an "inside" or interior lot.

demnor may pay more to avoid the expense and uncertainty of a condemnation proceeding and the seller may accept less for the same reason. 5 Nichols, *Eminent Domain*, § 21.33 (3d ed. 1962) ; 1 Orgel, *Valuation under Eminent Domain*, § 147 (2d ed. 1953).

However, we think the better view is that such evidence should not be automatically excluded as a matter of law. If it can be shown to the satisfaction of the trial court that the price paid was sufficiently voluntary to be a reasonable index of value, or that there is a necessity for the evidence because the only sales of comparable property in the area in recent years have been to the condemnor, such evidence should be admitted.[2] *Charleston & Western Carolina Ry.* v. *Spartanburg Bonded Warehouse*, 151 S.C. 542, 149 S.E. 236; *County of Los Angeles* v. *Faus*, 48 Cal. 2d 672, 312 P.2d 680; *Eames* v. *Southern New Hampshire Hydro-Electric Corp.*, 85 N.H. 379, 159 A.128; *Hannan* v. *United States*, 76 U.S. App. D.C. 118, 131 F.2d 441; *State* v. *McDonald*, 88 Ariz. 1, 352 P.2d 343. Note, 31 So. Cal. L. Rev. 204 (1958). Note, 9 Hastings L.J. 101 (1957).

It is said that the elements of compulsion, coercion or compromise are inherent in the nature of other sales to a condemnor thus affecting the value of land so that

---

[2] *City and County of Honolulu* v. *Bishop Trust Co.*, 48 Haw. 444, 404 P.2d 373, presented the question of whether there was error in excluding evidence of new rent set by a lease evidently providing for periodic renegotiation of the rent. It was noted that in the lease situation, if the parties failed to agree on the new rent then the matter would be determined by arbitration or some means other than agreement by the parties. For this reason, it was said that the agreement reached may be in the nature of a compromise, similar to a sale under threat of condemnation. Consequently, the court found no error in the exclusion of the evidence by the trial court.

However, the court did not rule that such leases and sales under threat of condemnation were inadmissible. It was noted that, if evidence of the new rent was sufficiently the result of free bargaining, it would be admissible. In effect, the matter of admissibility was left to the trial court's discretion. Consequently, there is no conflict or inconsistency with that case.

any estimate derived from sales to a condemnor is unreliable and should be excluded from evidence automatically.[3] We think the question of whether there was compulsion which affected the price of property in transactions involving a condemnor may in some circumstances go only to the weight of the evidence in which event the evidence may be admitted within the discretion of the trial court.[4] *County of Los Angeles* v. *Faus, supra; Covina Union High School District* v. *Jobe,* 174 Cal.App. 2d 340, 345 P.2d 78; *Hannan* v. *United States, supra; Louisiana Ry. & Navigation Co.* v. *Morere,* 116 La. 997, 41 So. 236; *State* v. *McDonald, supra.* A statement of the matter is presented in *City of Los Angeles* v. *Cole,* 28 Cal. 2d 509, 519-24, 170 P.2d 928, 934-37 (dissenting opinion, majority view in the later case of *County of Los Angeles* v. *Faus, supra*) :

"* * * On the general theory evidence of those sales was probative evidence of value. The only question is whether it should be excluded because it violated the substantive law test of market value; that is, a buyer

---

[3] A different point of view that the power of condemnation is not a club but a defense against extortion is revealed in *Langdon* v. *New York,* 133 N.Y. 628, 31 N.E. 98: "Much stress was laid by counsel upon the fact that the purchases were made under coercion; that is, that the city was compelled to buy or suspend the work of dock improvements, which would subject it to great loss. But it is not seen that the relation of the defendants' enterprise to the property so purchased differs in any material respect from its attitude with reference to the plaintiffs' property. In both cases the city is compelled to buy and the owner compelled to part with his title; but in neither case can it be said that the price was or is a matter of compulsion. The law has wisely guarded the municipality against extortion by providing a method of judicial procedure for the ascertainment of the just and fair value of the property taken, which the defendants can be required to pay and the owner compelled to accept. * * *"

[4] To say that the trial court would be searching into the motives of the parties to decide whether there was compulsion, coercion, or compromise does not solve the problem facing the jury which is trying to determine elusive fair market value. A rule of non-admissibility may lead to a dearth of information resulting in vacuous speculation by the jury. It is assumed, of course, that the trial court will keep within the limits of discretion allowed in these cases when deciding whether to admit.

and seller willing to deal and not acting under compulsion. That, however, is a matter going to the weight or value of the evidence not its admissibility and can properly be governed by the discretion of the trial judge. (See Wigmore on Evidence (3d ed.) vol. II, p. 505, § 463; 4 Cal. L. Rev. 151, 152). If the circumstances of a particular sale are such that it was not a free bargain between the parties it might not be very valuable in ascertaining market value, but that depends upon the facts. All sales merely because they are to the condemner are not under fear or compulsion or lacking in freeness. The condemner may well be paying what it feels the property is worth and the buyer selling for a price he believes is fair. * * * In *Eames* v. *Southern New Hampshire Hydro-Electric Corp., supra,* p. 130, [85 N.H. 379, 159 A. 128] the court said: 'What the courts, holding to the majority view [that other sales to the condemner are not admissible], have seemingly done, is to adopt the mere [*sic*] pronounced phenomena incident to sales to a condemner as a conclusive test of their probative character. Although such sales are less likely to have useful evidentiary value than sales to strangers, no logical reason in principle is perceived why they should not have the same treatment. Their relative immunity from irrelevant influences is merely a matter of degree, and their reasonable freedom therefrom purely a matter of proof. The test of the probative character of a given sale of either class is to be found in answer to the inquiry whether the motivating circumstances influencing the parties thereto were such as probably to materially affect the price paid, and therefore to destroy its usefulness as a standard of value.' "

The admissibility of such evidence as to its probative value weighed against elements of compulsion, coercion,

or compromise is left to the trial court in its discretion so that the jury may be placed in the best position to pass upon the ultimate question of fact. *Hannan* v. *United States, supra.* The trial court is usually given wide discretion in these matters, the question being whether it is satisfied that the price paid was sufficiently voluntary to be a reasonable index of value. Unless there is a clear indication of abuse resulting in prejudicial error, the trial court's exercise of discretion should not be overruled. See *People* v. *Murata,* 161 Cal. App. 2d 369, 326 P.2d 947.

Referring to the nature of sales to a condemnor without mentioning the interposing consideration given to such sales by an expert witness in *Curley* v. *Mayor and Aldermen of Jersey City,* 83 N.J.L. 760-62, 85 A. 197-98, 43 L.R.A. (n.s.) 985, 988-90, it is stated:

"* * * Almost all sales, however, are necessarily influenced, on one side or the other by considerations outside of the fair market value of the property. Either the seller is influenced by the circumstances of his affairs, which make it desirable for him to sell even at some sacrifice, or else he thinks he is getting more for his property than its real worth; and, on the other hand, the purchaser has some special need or use for the property which makes it more valuable to him than to others not having such need, or else he thinks he is buying at less than the property is really worth. If the sale, as here, takes place between parties, one of whom has the power to condemn, it may likewise be that the seller or the buyer, and possibly both, are influenced by other considerations as well as by what they think is the fair market value of the property. The seller may think that if he does not sell amicably he will be put to the expense of being properly represented at the condemnation proceedings; but, on the other hand, he doubtless weighs against this the fact

that a jury is very apt to give a liberal market value for properties taken under condemnation for the very reason that the owner is being compelled to sell against his will. The purchaser, on the other hand, knowing that what the law requires him to pay is at least a fair value, and knowing that a jury is inclined to construe this as meaning a value particularly 'fair' to the man who sells against his will, may also be somewhat influenced. But, in the absence of extraordinary circumstances, we are unable to see, as a general rule, why private sales to parties having the right to condemn do not come quite as near representing in their results true market value as do such sales made between parties, neither of whom have this power. It is easy enough to imagine special circumstances, falling in each class, where the result in the price obtained is, because of such special circumstances, so clearly abnormal as to destroy the similarity which must exist in order that the evidence shall be admissible. In other cases where the special circumstances are not of sufficient importance to produce this result, they may nevertheless affect the weight of the evidence, and be used for that purpose before a jury. This is so whether the purchaser is or is not a party having the power to condemn."[5]

---

[5] The New Jersey opinion does not mention any safeguards to be observed requisite to the use of such evidence. Neither does it seem to make a distinction between such evidence offered as substantive proof of market value or considered by an expert witness in support of his opinion. The facts in that case do not show on what grounds such evidence was admitted. Later New Jersey cases indicate that other sales to a condemnor are treated as other comparable sales with the test of admissibility being similarity of conditions. See *Moorestown* v. *Slack*, 85 N.J. Super. 109, 204 A.2d 23. See also *State Highway Commission* v. *Lally*, 147 A. 487, (N.J. Sup. 1929), (per curiam) where the court upheld the refusal of the trial judge to permit a witness to testify as to the price the state had paid for contiguous property because it was within the discretion of the trial judge, upon the proofs, to find the condition not comparable, in that the price paid by the state was in the nature of a compromise.

We hold that evidence of other sales to a condemnor used in support of an expert witness' opinion is admissible in the discretion of the trial court. The admissibility of such evidence if offered as direct evidence of value is not before us.

### B.

We now turn to the question of whether the trial court abused its discretion in admitting the particular evidence of other sales objected to by the plaintiff. On direct examination prior to the admission of the disputed evidence, defendant's appraiser testified at some length as to his method and criteria in arriving at an opinion as to the value of defendant's property.[6] So far as can be seen from

---

[6] "Defendant's Witness: '* * * So as far as possible, I studied and checked from the government records all the known sales; and second, I made a list of all the significant transactions—that is, the sales and leases—which have a bearing on the value of the subject property. Those which are dissimilar—not the same kind—smaller in size and too far removed or they are non-bona fide transactions—I discarded them.

"Then after I made this list, I selected the ones that are most pertinent—they are most true—to giving the comparison.

"Now, these transactions which I investigated are called data property—properties which give data. They sometimes use, say 'comparable properties', but that is not the correct terminology because no piece of property is wholly comparable to the subject property. In other words, it is comparable in certain features like time, location, characteristics, shape, dimension—they are somewhat similar—but it is not truly comparable. So when I say the 'data properties' are the properties we use for comparison, I think it is more accurate to say the data property is used for comparison purposes.

 *  *  *  *  *

"Then after you have this list, you have made your range. It is just like a scale. You have a scale—well, so much here; so much here; so much here. You have a scale of values. And this is the scale which is going to help you determine what is the value of the property.

"Now, the data property transaction will give you indications of this land value but what you get from the data property is not going to dictate or control the value of the subject property down at River Street. It has no relation whatsoever with that market at all. It still has to meet the skill and the talent of the appraiser to adjust or try to see what the subject property would sell for in the market at that time, considering all those transactions which occurred in the past. So that is the job of the appraiser—is trying to relate the elements of time, location and the size and shape of the property to those transactions which occurred.

"Q. (Mr. Borthwick) Have you prepared a map or maps, Mr. Lum,

the discussion which took place out of the hearing of the jury, the trial court thought that such evidence was an indication of value. This ruling was supported by evidence offered by the defendant to the effect that it was very difficult to find comparable properties to get indications of value since there were large sections of land

locating these properties which you took into consideration?

"A. Yes, I did. And I have also the indications—that is, the land value charted on an exhibit, which will help you visualize—

"MR. BORTHWICK: (Interrupting) May I have those maps so I can show them to counsel, please?

(Mr. Tashima examining documents. )

"MR. TASHIMA: Let's approach the Bench.

(Respective counsel and the reporter approached the Bench where the following proceedings took place out of hearing of the jury:)

"MR. TASHIMA: I would like to object to the submission of the maps on the ground that they show transactions involving the Government.

"THE COURT: The City Government?

"MR. TASHIMA: H.R.A. And it is within this parcel. It is within the bounds of the Kukui parcel.

"THE COURT: What's wrong with that?

"MR. TASHIMA: Well, this is condemnation. It is not a true sale—a willing buyer, willing seller.

"MR. BORTHWICK: These are not court cases.

"MR. TASHIMA: Regardless.

"MR. BORTHWICK: These are Government sales. I will readily admit the law says the Government can use them.

"MR. TASHIMA: Negotiated sales—and most of it is within the bounds of the Kukui parcel.

"THE COURT: Isn't that some indication of value according to the Government? I will allow it.

"MR. TASHIMA: I object to the figures.

"THE COURT: He wants the figures—don't you, Mr. Borthwick?

"MR. TASHIMA: This will take protracted cross examination.

"THE COURT: I will give you one week—don't worry.

(Respective counsel and the reporter resumed their places in the courtroom and the following proceedings took place in the hearing of the jury:)

"THE COURT: You want to argue that matter in the absence of the jury? Do you think it is important enough? You have authority?

"MR. TASHIMA: Yes, I do, your Honor. I don't have authority at my finger tips but I know that there are authorities because I have read that point.

"THE COURT: I will make the ruling. Proceed. You object for the record?

"MR. TASHIMA: Yes.

"THE COURT: The objection is overruled."

removed for government uses reducing the availability of land for private transactions. Although the valuation date was March 1961, the area had been blighted by the project since October 1950. Defendant's witness testified that there was a lack of true indicators of value in the area of defendant's property because the area had been blighted in 1950 so that the market was stagnant and transactions which occurred did not reflect the maximum potential of the properties. In effect, because of the scarcity of private transactions of comparable lands within the area, it was necessary to use government transactions as bases from which an expert witness could form an opinion of value. Further, in the light of the principle set forth as a guide in *Territory* v. *Adelmeyer,* 45 Haw. 144, 147-48, 363 P.2d 979, 982, followed in *City and County of Honolulu* v. *Bishop Trust Co.,* 48 Haw. 444, 404 P.2d 373, that with respect to evidence of value in eminent domain proceedings any evidence which will aid the jury in fixing the fair market value of the property should be considered by them, it cannot be said that there was an abuse of discretion under the circumstances.[7]

We find that the trial court did not err with respect to plaintiff's first and second specifications of error.

## II.

We disallow plaintiff's third specification of error that the trial court erred in admitting evidence of transactions

---

[7] Evidently, according to the record and defendant's expert witness, there were very few private sales or leases to indicate value outside of the Kukui and Queen Emma Redevelopment Project Areas which surrounded the defendant's property to the west, north and northeast. The central business district zone is located south and southeast of the defendant's property.

Two 55-year leases and a sale located within two blocks from the defendant's property in the central business district zone were leased or sold between 1960 and 1962 for about $15 to $17 per square foot. The physical shape and location of these properties, however, were more desirable than defendant's property. In the instant case, the complaint and summons were filed in 1961. The jury's verdict was roughly $7 per square foot.

involving properties on the south or Waikiki side of Nuuanu Avenue in that these properties were too remote from and are not comparable with the condemned parcel and that the allowance of such evidence constituted an abuse of discretion.

It is interesting to note that two of plaintiff's comparable properties were also located on the Waikiki side of Nuuanu Avenue in a primarily residential area about the same distance from the defendant's property (zoned commercial) as the comparable property complained of here. These facts seem to indicate that the plaintiff as well as the defendant had difficulty in finding comparable properties near the defendant's property.

At all events, plaintiff's objection came too late. Defendant's witness had testified without objection concerning the properties deemed comparable. It was only when maps were offered of the same subject matter that objection was made. The record is not such as to support a finding of prejudicial error. *Cf., Gay* v. *Farley,* 16 Haw. 69, 78-79; *Siebrand* v. *Gossnell,* 234 F.2d 81, 95 (9th Cir.); 5 Am. Jur. 2d, *Appeal and Error,* § 601.

The judgment appealed from is affirmed.

*Vernon T. Tashima (Ted T. Tsukiyama and Harry T. Tanaka* with him on the briefs) for Plaintiff-Appellant.

*Frank D. Padgett (Robertson, Castle & Anthony* of counsel) for Defendant-Appellee.