CITY AND COUNTY OF HONOLULU, a municipal corporation, Plaintiff-Appellee, *v.* INTERNATIONAL AIR SERVICE COMPANY, LTD., a California corporation, Defendant-Appellant, and BONDED INVESTMENT COMPANY, LTD., a Hawaii corporation, and STATE OF HAWAII, through its Attorney General, Defendants

NO. 6428

APRIL 29, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Defendant-appellant International Air Service Company, Ltd. (hereafter IASCO) appeals from a judgment awarding it $3,450,000 as just compensation, on the verdict of a jury, in an eminent domain proceeding for the acquisition of approximately 12.6 acres of leeward Oahu beachfront land brought by Plaintiff-appellee City and County of Honolulu (hereafter the City). Seeking a new trial, IASCO asserts errors in evidentiary rulings and jury instructions. But we conclude from a review of the record and applicable precedent that the trial court committed no reversible error and affirm the judgment.

I.

A.

In 1965 and 1966 the City acquired, for park purposes, thirteen acres of a forty-three acre tract of beachfront real estate situated at Lualualei, Waianae, between Farrington Highway and the ocean, which was then held by Bonded Investment Company, Ltd. (hereafter Bonded). Bonded subsequently subdivided the remaining thirty acres into forty-seven lots and in 1968 sold nineteen of them, fifteen of which were sold under an agreement of sale, to IASCO, who purchased the land for possible development. The subdivided parcels were all zoned partly for apartment use and partly for residential use, the portions of each lot nearer the highway being designated for apartment use and the remainder of each being designated for residential use. Roughly two-thirds of the land purchased by IASCO was in an A-1 apartment zone.

Pursuant to resolutions adopted by the City Council in 1969, the City was authorized to acquire the fifteen lots that were subject to the

agreement of sale between IASCO and Bonded, along with adjoining and nearby parcels held by other owners, for an extension of Maili Beach Park. While the City succeeded in negotiating purchases with most of the other owners, it failed to do so with IASCO. Meanwhile, IASCO actively sought other buyers for its property, and in January of 1974 agreed to sell all of the fifteen parcels to another developer. This agreement, however, was made subject to cancellation if the property became subject to condemnation proceedings within two months.[1]

Shortly thereafter, on February 6, 1974, the City commenced an eminent domain suit to acquire the fifteen lots for the authorized park extension. The property it sought to acquire consisted of 549,434 square feet of land (approximately 12.6 acres) with an ocean frontage of 1,246 feet and a highway frontage of approximately 1,200 feet.[2]

## B.

The sole issue at trial was just compensation. Each party's presentation of evidence consisted largely of testimony elicited from its expert on land valuation. Both appraisers purportedly relied on the "market data" approach, a method which measures value by comparison to sales of similar property.[3] But as is often the case, there

---

[1] The filing of the condemnation suit aborted this transaction and only the four lots not subject to the agreement of sale ultimately were sold to the developer at what IASCO claims was a distressed price. The sale of the four lots occurred in September of 1973.

[2] The complaint also named Bonded and the State of Hawaii as defendants. But both were dismissed from the case before trial, Bonded being dropped therefrom after its security interest in the property was extinguished by IASCO's payment of the full purchase price stipulated in the agreement of sale with moneys deposited by the City when suit was filed.

[3] As a general rule evidence of "comparable sales" to aid the trier of facts in determining value is admitted where the following conditions are present:

The sales of the other tracts must have been sufficiently near in time, and the other land must be located sufficiently near the land to be valued, and must be sufficiently alike in respect to character, situation, usability, and improvements, to make it clear that the two tracts are comparable in value and that the price realized for the other land may fairly be considered as shedding light on the value of the land in question.

County of Los Angeles v. Faus, 48 Cal. 2d 672, 678, 312 P.2d 680, 684 (1957).

was a significant disparity in the estimates of "fair market value."[4] And as is usually the situation, the taker's expert submitted the lower valuation of $6.28 per square foot and the owner's expert arrived at a higher valuation of $10.00. The jury's verdict, which IASCO maintains was inadequate, closely approximated the value placed on the property by the City's expert.

IASCO contends the trial court erred by:

1. Admitting evidence related to prior transactions between the City and other owners although a foundation for the admission of such evidence was not established;

2. Admitting evidence of transactions not disclosed by the City before trial although the non-disclosure violated a pre-trial order;

3. Not allowing IASCO's president to state his opinion on the value of the condemned land;

4. Permitting the City's expert to use the aborted 1974 agreement of sale covering the condemned property as a "comparable sale" but not allowing IASCO to demonstrate an alleged "depressing" effect of the condemnation on the agreed price;

5. Unduly limiting the testimony of IASCO's expert with regard to evidence purportedly supporting his valuation; and

6. Improperly instructing the jury in several respects.

The trial court's erroneous rulings in the foregoing regard, IASCO argues, were primarily responsible for the jury's failure to return a verdict reflecting the "fair market value" of the property taken.

II.

"[T]he general aim of proceedings in eminent domain is to arrive at an amount of just compensation which as nearly as possible approximates the value which a free market would attach to the taken property." *City & County v. Market Place, Ltd.*, 55 Haw. 226, 242, 517 P.2d 7, 19 (1973). Value, according to a well-respected

---

[4] The difference stemmed primarily from the selection of different "comparable sales" and the employment of dissimilar adjustment factors to render the selected sales more timely for purposes of comparison.

treatise, "is always a matter of opinion." 5 Nichols', *The Law of Eminent Domain* § 18.1, at 18-5 (3d ed. 1979). Our adoption of liberal standards on the admissibility of an expert's opinion on value and evidence purportedly supporting an expert's opinion on value in condemnation trials is consonant with the foregoing observation. *State v. Kunimoto*, 62 Haw. 502, 507-08, 617 P.2d 93, 98 (1980); *State v. Dillingham Corp.*, 60 Haw. 393, 411, 591 P.2d 1049, 1060 (1979). *See also State v. Martin*, 54 Haw. 167, 170, 504 P.2d 1223, 1225 (1973); *Honolulu Redevelopment Agency v. Pun Gun*, 49 Haw. 640, 647, 426 P.2d 324, 328 (1967); *City & County v. Bishop Trust Co.*, 48 Haw. 444, 463, 404 P.2d 373, 385 (1965). On more than one occasion we also have said "any evidence which will aid the jury in fixing the fair market value of the property should be considered by them." *State v. Kunimoto, supra,* 62 Haw. at 507, 617 P.2d at 97; *State v. Dillingham Corp., supra,* 60 Haw. at 406-07, 591 P.2d at 1057; *State v. Martin, supra,* 54 Haw. at 170, 504 P.2d at 1226; *Honolulu Redevelopment Agency v. Pun Gun, supra,* 49 Haw. at 649, 426 P.2d at 329; *Territory v. Adelmeyer,* 45 Haw. 144, 147, 363 P.2d 979, 982 (1961).

We nevertheless recognize "prospective buyers of property in normal conditions would consider *all* matters subject to scrutiny which conceivably may affect the value of property," but "juries in eminent domain proceedings are insulated from the realities of the marketplace and hence are not equipped to give proper weight to indicia of highly remote values." *City & County v. Market Place, Ltd., supra,* 55 Haw. at 242, 517 P.2d at 19 (emphasis in the original). Thus, "courts generally exclude evidence of values which, in their estimation, are so 'speculative' as to be unduly confusing to the jury." *Id.* Our decisions embody a further belief that the trial judge's vantage point normally affords a clearer prospect of the thin line that often separates competent opinion and relevant values from mere speculation and "indicia of highly remote values" than our more distant position. Hence, we are disinclined to disturb a trial judge's assessment that the proffered evidence reflects, or does not reflect, speculation or remote values, unless a clear abuse of the discretion vested in him is apparent. *State v. Kunimoto, supra,* 62 Haw. at 506, 617 P.2d at 97; *State v. Dillingham Corp., supra,* 60 Haw. at 411, 591 P.2d at 1060; *State v. Martin, supra,* 54 Haw. at 170, 504 P.2d at 1226; *Honolulu Redevelopment Agency v. Pun Gun, supra,* 49 Haw. at

645, 426 P.2d at 327; *State v. Heirs of Kapahi,* 48 Haw. 101, 113, 395 P.2d 932, 939 (1964).

## III.

### A.

Turning to the questions presented for decision by IASCO, we initially consider the admissibility of evidence of negotiated sales to the City of property similarly subject to condemnation.

In *Honolulu Redevelopment Agency v. Pun Gun, supra,* we recognized that a majority of courts deemed evidence of sales to the condemnor of land earmarked for.condemnation inadmissible to substantiate market value because such sales "are almost always in the nature of a compromise." 49 Haw. at 641, 426 P.2d at 325. But we found "the better view is that such evidence should not be automatically excluded as a matter of law" and concluded:

> If it can be shown to the satisfaction of the trial court that the price paid was sufficiently voluntary to be a reasonable index of value, or that there is a necessity for the evidence because the only sales of comparable property in the area in recent years have been to the condemnor, such evidence should be admitted.

49 Haw. at 642, 426 P.2d at 325-26 (citations and footnote omitted).[5] Responding to a suggestion that "compulsion, coercion or compromise" was inherent in such sales, we noted the power of condemnation is not regarded invariably as a "club" held by government, but is perceived also as a "defense against [the] extortion" of government. 49 Haw. at 643 n.3, 426 P.2d at 326 n.3. And in our opinion,

> the question of whether there was compulsion which affected the

---

[5] *Pun Gun,* like this case, involved the admissibility of evidence of other sales to a condemnor to support the opinion of an expert witness, and our precise ruling there reads as follows:

> We hold that evidence of other sales to a condemnor used in support of an expert witness' opinion is admissible in the discretion of the trial court. The admissibility of such evidence if offered as direct evidence of value is not before us.

49 Haw. at 647, 426 P.2d at 328. We also do not reach the "admissibility of such evidence if offered as direct evidence of value" here.

price of property in transactions involving a condemnor may in some circumstances go only to the weight of the evidence in which event the evidence may be admitted within the discretion of the trial court.

49 Haw. at 643, 426 P.2d at 326 (citations and footnote omitted).

The parties acknowledge *Pun Gun* as pertinent precedent. But IASCO nonetheless maintains it was error to allow testimony on the negotiated sales of land subject to condemnation by the City because there was no affirmative demonstration that the transactions were "sufficiently voluntary," as required under *Pun Gun*.[6] In its opinion, a specific finding by the trial judge "that the sales to the condemnor were not of a forced character" was a necessary predicate for the admission of the evidence. The City replies its expert's use of the sales as partial support for his estimate of value was sanctioned by *Pun Gun* because of a definite paucity of other timely transactions.

*Pun Gun* does not harbor a suggestion that the prerequisites for the admission of the disputed evidence are as stringent as IASCO would have them. The specific holding there was that such evidence is admissible "in the discretion of the trial court," and the court's discretionary authority was not fettered thereby in the manner IASCO contends. But *Pun Gun* also carries no implication that a mere absence of sales to buyers other than the condemnor dispenses with a necessity for the exercise of sound discretion. The trial judge is still obliged to assess the proffered evidence and to exclude sales that are not likely to shed light on the *fair* market value of the land in question.

The record indicates there was reason for the trial judge to conclude the disputed evidence had probative value and that the jury could consider it along with other indicia of market value without being misled. There was, as the City claims, a definite lack of

---

[6] The City's expert referred to thirteen "comparable sales" as supporting evidence for his opinion of value. Six of the transactions involved land subject to condemnation and occurred subsequent to the Council resolutions declaring the municipality's intent to acquire such land. IASCO contends the admission of evidence related to these six transactions was error.

timely private sales of comparable nature;[7] the City informed IASCO in advance of trial that its expert would seek support for his estimate of value from such transactions, and IASCO had an opportunity to develop evidence on possible compulsion related thereto; and there was no affirmative evidence of compulsion surrounding the negotiated sales.[8] Moreover, the jury was fully apprised thereafter of the circumstances surrounding the relevant transactions. We observe no abuse of discretion here.

B.

The next question presented for decision is whether the trial court erred when it permitted the City's expert to refer to selected sales of admittedly dissimilar real property for the purpose of establishing the trend of increases in property values in the Maili area. IASCO's objection is grounded on a pre-trial order entered by another judge at the City's request, compelling an exchange of lists of "sales and offers of real property" to be relied upon by the parties' experts at trial.[9] It claims both "surprise" and "prejudice."

IASCO's assertion of prejudicial conduct on the part of the City is not without foundation. Paragraph 2 of the pre-trial order furnishes a rational basis for contending the failure to divulge the

---

[7] The last transaction between private parties that the City's expert found "comparable" occurred in February of 1969. There was a lapse of approximately five years between the foregoing event and the commencement of the eminent domain action. IASCO's expert also was compelled to seek "comparable sales" beyond the Maili beach area for this reason.

[8] *See* Township of Moorestown v. Slack, 85 N.J. Super. 109, 204 A.2d 23 (1964), where the court stated in part:

In the absence of affirmative evidence that the sellers were under compulsion, sales to an authority having the power of condemnation do not by reason of that fact alone necessarily lose competency or significant probative weight.

85 N.J. Super. at 115, 204 A.2d at 26. However, we do not suggest that all evidence of sales to condemnors is admissible in the absence of affirmative evidence of compulsion.

[9] The relevant portions of the pre-trial order read:

2. Plaintiff and Defendants International Air Service Company, Ltd. and State of Hawaii shall furnish to each other a list of sales and offers of real property which it will or may contend on the trial have been taken into consideration or

selected transactions before trial contravened the court's mandate, particularly if paragraph 2 is read alone. But when the paragraph is read in conjunction with paragraph 7 of the order, a plausible ground for the City's assertion that the order only contemplated a disclosure of "comparable sales," not those its expert would utilize to establish a "time trend," also appears.

The reference to "alleged comparable parcels" in paragraph 7 bolsters the City's contention that the order only covered the disclosure of "comparable sales,"[10] not acknowledgedly dissimilar transactions utilized to update allegedly comparable sales. Furthermore, when the City's docket of "comparables" was presented to IASCO, it was qualified by a notation that it did not include other transactions to be employed in establishing a trend of rising property values in the Maili area.[11] And while the communication seemingly encouraged a discussion of the matter, it failed to elicit a response from IASCO.

Though paragraph 2 literally compelled a prior disclosure of all transactions to be used in arriving at estimates of value, we are unable to conclude the trial court's application of the pre-trial order entered by another judge was unreasonable, for paragraph 7 purportedly foreclosed only evidence of undisclosed sales of allegedly "comparable parcels." Furthermore, IASCO was placed on notice that the City would seek to update otherwise comparable sales

---

should be taken into consideration in arriving at the alleged fair and reasonable value of the subject parcels sought to be condemned in this action.

. . . .

7. Upon the trial none of the parties herein will be permitted to offer evidence of any sales of alleged comparable parcels not included in the lists furnished pursuant to this Order, except by an order of this Court granted upon a showing of good cause why any such parcel was not included in said lists.

[10] *See* note 3 *supra,* for generally accepted meaning of "comparable sales" within the relevant context.

[11] The other transactions were eleven sales of land in the Maili area that occurred between March of 1967 and May of 1974. They involved non-beachfront, residential property for the most part. The City's expert referred to these sales in attempting to establish annual rates of increasing land values in the Maili area. The rates of increase were applied to allegedly comparable but outdated sales in arriving at his estimate of relevant market value.

through other transactions, it could have sought further information on the matter, the sales were admittedly dissimilar, and as the trial court observed, the evidence was not, in a strict sense, "market data." We also see no sound basis for reversing the trial court here.

## C.

Citing *Territory v. Adelmeyer, supra,* IASCO next contends the trial court's foreclosure of the attempt of its president to give his opinion of the market value of condemned land constituted reversible error. Its particular point of reference is the following passage therefrom:

> An owner, by virtue of his ownership and consequent familiarity with the land and real estate market, is generally held to be qualified to give his opinion as to the value of his land, the weight to be given such testimony being a question for the jury.

45 Haw. at 158, 363 P.2d at 987. We do not denigrate *Adelmeyer's* precedential value but do not deem it controlling in this instance.

*Territory v. Adelmeyer, supra,* iterates a widely accepted rule that "the owner of the land taken . . . [is] qualified to express his opinion of its value merely by virtue of his ownership." 5 Nichols', *supra* § 18.4[2], at 18-141 to 143.[12] Most courts presume an owner is familiar with his land and the market therefor and thus is competent to state an opinion of its value. But they have been reluctant to expand this presumption of knowledge that lends probative worth to an individual owner's opinion to include a corporate owner and its officers.[13] And a majority of courts hold that "[a]n officer of a corporate owner is not qualified to testify as to value unless he is an expert." 5 Nichols', *supra* § 18.4[2], at 18-163 & n.33 (1979 & Supp.); *Newton Girl Scout Council, Inc. v. Massachusetts Turnpike Authority,* 335 Mass. 189, 198,

---

[12] However, this section of the treatise goes on to say:

The weight of his testimony is for the jury, and it is generally understood that the opinion of the owner is so far affected by bias that it amounts to little more than a definite statement of the maximum figure of his contention, thus taking the place of the *ad damnum* of the writ in ordinary civil cases.

5 Nichols', *supra* § 18.4[2], at 18-156 (footnote omitted).

[13] A corporate officer, particularly an officer of a large corporation, probably would not be as familiar with the corporation's land holdings as an individual owner is with his.

138 N.E.2d 769, 775-76 (1956). *Contra, State ex rel. Smith v. Livingston Limestone Co.,* 547 S.W.2d 942, 943-44 (Tenn. 1977). We see no cogent reason to part company with the majority on this issue.

Hence, the question for decision is whether the ruling that the corporate officer's opinion was not competent evidence of value represents an abuse of the trial court's discretion. IASCO maintains its president was also qualified to give his opinion on the value of the property subject to condemnation because of a prior experience with real estate transactions and a keen interest in the property and its development. The City contends there was an insufficient showing that his knowledge of values was current and that it extended to the relevant real estate market. From a review of the record we conclude there was no abuse of discretion, since there was a basis for holding the officer was not competent to tender an opinion for the jury to consider. *Cf. City & County v. Market Place, Ltd., supra,* 55 Haw. at 248, 517 P.2d at 22-23 (the trial court did not abuse its discretion when it ruled an experienced appraiser was not qualified to testify in a case involving property subject to development as an apartment condominium due to a lack of experience in appraising such projects).

### D.

IASCO next contends there was an unevenness in evidentiary rulings disfavoring it, particularly in regard to evidence on the 1974 agreement for the sale of the condemned land.

We earlier noted the City's expert was allowed to discuss the agreement as a comparable sale and his estimate of market value was premised in part on the aborted sale. IASCO maintains the trial court erred by not permitting it to fully develop evidence that the agreement actually did not represent a "comparable" because the price was depressed by the threat of condemnation. The rejected evidence purportedly was testimony to be adduced from an officer of Quality Pacific Homes Corporation, the other party to the agreement of sale, that it intended to donate part of the subject property to the City in an attempt to free the remaining portion from the impending condemnation, and thereby retain a right to develop the

remainder.[14] The planned donation, IASCO argues, was the reason for a purchase price below market level. This, of course, can not explain IASCO's willingness to accept such an offer.

The earlier discussion of principles governing the admissibility of evidence in an eminent domain trial noted a jury ordinarily should have access to any competent evidence of matters that may affect value, but that speculation and indicia of remote values ought not be presented to it. As recited by counsel, the proffered evidence was speculative, or bordered thereon. Counsel's offer of proof covered a claimed readiness on the part of Quality Pacific to donate a tract of unspecified size to the City, for which the City presumably would have foregone the right to acquire the rest of the land it had indicated it would. But the putative evidence covered neither the City's interest in the proposition nor a likelihood of its acceptance of the "gift" under such conditions; even the possibility of an execution of the plan could not have been established thereby.

We have not been disposed to disturb a trial court's rejection of evidence of a plan for future action even where its implementation was a possibility. *Cf. County of Hawaii v. Sotomura,* 55 Haw. 176, 186, 517 P.2d 57, 64 (1973), *cert. denied on another issue,* 419 U.S. 872 (1974) (evidence of an owner's plans for the development of his property, even if such development is possible, is inadmissible if it is not shown that there is a reasonable probability that it can be undertaken).[15] *Accord, City & County v. Plews,* 55 Haw. 199, 211, 516 P.2d

---

[14] The specific offer of proof made by IASCO's counsel was:

We would offer to prove that knowing of the oncoming condemnation, QualPac was prepared to, in effect, donate 30 to 50 percent of the property to the City in return for retaining the right to develop the [balance] of it. We would say that this has a direct bearing on the $6.00 per square foot price pegged in the D.R.O.A. and something the jury should be allowed to consider because, obviously, the price is determined not only from the seller's standpoint but also from the buyer's. And as a so-called free market place transaction, all the elements that went into the determination of that price between the parties should be properly considered. If they were going to only use 50 percent of the property and pay $6.00 a square foot for the entire property, then obviously they were paying more than $6.00 a square foot for the property that they could use.

[15] The following excerpt from Olson v. United States, 292 U.S. 246 (1934), was quoted with approval in *Sotomura,* 55 Haw. at 186, 517 P.2d at 64:

Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably

1259, 1267 (1973). While Quality Pacific may have been "prepared" to make a "gift" of land, the indefinite elements in the proposed transaction, about which no competent evidence was even proposed, diminished the probative value of the testimony in question. There was no proof offered of a reasonable possibility, let alone a probability, that Quality Pacific's plan could have been executed. Nearly everything about it remained conjectural. The trial court did not treat the evidence presented by the City and that offered by IASCO evenly, but there appears to have been good reason therefor. What the City presented was concrete evidence; what IASCO proposed was not. The probative value of the testimony in question was questionable at best, and it could have been more confusing than enlightening for the jury. We find the trial court's ruling was within permitted discretion.

## E.

IASCO maintains the trial court was unduly restrictive in rulings on its expert's attempts to discuss evidence supporting his estimate of fair market value in two respects.

It assigns as error the court's exclusion of testimony related to nineteen transactions other than the eight presumably comparable sales in the vicinity of the subject property in Maili that the expert was allowed to discuss. The nineteen transactions, which the expert claimed also were comparable, involved real property situated in the adjoining community of Waianae and in the more distant communities of Makaha and Ewa.[16] The record, however, does not denote what the expert's claim of comparability was bottomed on. The trial

---

probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value — a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

292 U.S. at 257.

[16] Most of the nineteen sales involved improved property zoned only for residential use, in contrast to the subject property's unimproved character and dual zoning.

court apparently concluded the nineteen sales involved land not "located sufficiently near the land to be valued" to be probative.[17] We have no reason to upset its determination.

Relying upon *City & County v. Market Place, Ltd., supra*, IASCO then argues the preclusion of its appraiser's attempt to employ an "economic analysis," in addition to market data, to support his valuation was error. The rejected evidence consisted of the appraiser's testimony and documentary evidence related to two hypothetical development plans for the subject property and the testimony of an engineer and an architect engaged by the appraiser subsequent to the taking to formulate the hypothetical development plans that purportedly demonstrated maximal use of the land.[18] While *Market Place* undoubtedly expanded the permissible scope of evidence concerning the probable enhancement of value through a use different from that extant at taking, IASCO's conception of its precedential breadth does not comport with the actual holding.

The subject property in *City & County v. Market Place, Ltd.* was land owned by Market Place, Ltd. (MPL) and zoned for residential use that had been leased under a long-term "developer's lease" antedating the taking, whereby DHS Corporation (DHS) had agreed to undertake the development of the land into a condominium apartment project. The trial court nevertheless rejected all evidence related to the planned development. In reversing the court's total foreclosure of attempts by MPL and DHS to pursue a "development approach", we said:

> Although a proposed use of property as an income-producing enterprise is merely in the planning stage at the time of its taking by condemnation, this factor alone should not operate to *exclude* competent evidence of the value that the market would apply to

---

[17] The relevant portion of the trial transcript reads:

He's (IASCO's expert) already given eight significant transactions which he feels were comparable properties in size, proximity, etc. That's it. He's going real far [a]field as to the adjustment, inflation, etc. The Court has permitted it. The Court will not permit this. It only befuddles the situation and confuses the jury. Objection will be sustained.

[18] The testimony that had been adduced earlier from the engineer was stricken; the architect's offered testimony was rejected.

the enterprise in light of its chances of success; rather, it should affect the weight that the jury may properly give to such evidence.

55 Haw. at 243, 517 P.2d at 20 (emphasis in the original). And we found the following precepts appropriate in a determination of the admissibility of evidence of income-producing uses other than the existing one:

From a harmonizing reading of *Bishop Trust* and *Bonded Investment*, the following principles emerge: A trial judge may properly reject unrefined figures with respect to profits or rentals on a project still in the planning stage as inadmissible evidence of value, since a jury may be incapable of assigning them their proper weight and hence they may be overly prejudicial to the condemnor. See also 5 NICHOLS § 19.22[2], at 19-24 to 25. On the other hand, evidence showing that a certain income-producing use at the time of condemnation was reasonably probable should be admitted. Once the trial court is persuaded by this evidence that the argued use is not so fanciful as to confuse the jury, expert testimony utilizing legitimate income stream analysis is wholly appropriate and should be admitted.

55 Haw. at 244, 517 P.2d at 20. In our further view, "evidence of value which, although relevant data in transactions on the open market, has a dangerous propensity overly to impress the jury" was properly excludable. 55 Haw. at 246, 517 P.2d at 22.

*Market Place* reflects our favoring of liberal rules on the admissibility of evidence in eminent domain proceedings, with discretion in the trial judge to exclude evidence whose probative value may be outweighed by its propensity to confuse or mislead the jury. That the planned development there was only in a planning stage at the time of taking did not necessarily render evidence of it inadmissible; admissibility of such evidence, in our view, turned on a showing of a reasonable probability of the projected use. We also cited other instances where evidence of non-existing uses had been admitted for valuation purposes, notably *City & County v. Bishop Trust Co., supra,* 48 Haw. at 466-67, 404 P.2d at 387; *United States v. 25.406 Acres of Land,* 172 F.2d 990, 992 (4th Cir.), *cert. denied,* 337 U.S. 931 (1949); *Dash v. State,* 491 P.2d 1069 (Alaska 1971). In *Bishop Trust,* we held that evidence of lease rentals of other nearby properties was admis-

sible to demonstrate a potential income stream; in *25.406 Acres of Land,* a federal appellate court ruled that testimony of a development that "had been definitely planned and agreed upon and would have been carried out but for the taking of the property" should have been admitted;[19] and in *Dash,* the Supreme Court of Alaska affirmed the trial court's admission of evidence that the highest and best use of a parcel of unclassified and unimproved land was for an industrial subdivision and that other property in the immediate area was subdivided for industrial use.

Any resemblance between IASCO's *ex post facto* and purely hypothetical development schemes and the circumstances in *Market Place, Bishop Trust, 25.406 Acres of Land,* and *Dash* is tenuous. And while *Market Place* was meant to liberalize the admissibility of evidence related to probable future uses of land, it did not transmogrify eminent domain proceedings into contests of imagination and ingenuity. A condemnation trial remains an ordered search for value that a free market would attach to the taken property.

A reading of the trial transcript convinces us the trial court exercised its discretion wisely, for what was involved was not a showing of a probable use premised on a planned development or evidence of a probability of future use observable from the present use of neighboring lands. *See City & County v. Market Place, Ltd., supra.* The "economic" or "market place" analysis was essentially an attempt to escalate values above those suggested in comparable transactions by highlighting ingenious development schemes designed to demonstrate maximal use of the property, not only under existing lot sizes and configurations but also under an assumed "reparcelization" of the land. Moreover, the "economic analysis" (the term used by the appraiser) or "market place analysis" (the term

---

[19] The opinion here read in part:

We do not mean to say, of course, that an expert witness should be allowed to. roam at large in the realms of fancy and testify at length about hypothetical developments and mythical income to be realized therefrom. When this is attempted it should be firmly suppressed because of its tendency to mislead and confuse and the waste of time involved. Nothing of this sort, however, is involved here. The development as to which testimony was allowed was one which had been carefully planned in detail before the taking by the government and one which would have been carried out but for the taking.

172 F.2d at 994 (footnote omitted).

applied by IASCO's counsel) was not an alternative valuation approach to verify or support an estimate of value derived from market data, despite counsel's terminology. A propensity to confuse or mislead, indeed, was discernible in what IASCO proffered.

### IV.

We next focus on questions raised about the instructions imparted to the jury. IASCO contends some of the City's requested instructions were given although they constituted inaccurate, incomplete, or misleading statements of law. It maintains that some of its instructions, on the other hand, were refused even though they represented accurate and material summaries of applicable law not otherwise covered. From a careful reading of the instructions in question within pertinent factual contexts we conclude the instructions given the jury accurately reflected applicable law, and that there was no abuse of discretion in the trial court's refusal to adopt those in question which were proposed by IASCO.

### A.

IASCO initially asserts the trial court erred in accepting the City's Instruction No. 2 and refusing IASCO's Instruction Nos. 1, 2, and 26. The upshot of these rulings, it claims, was the jury's being uninformed of the concept of just compensation in eminent domain proceedings and the jury's being unapprised that a corporate defendant is entitled "to the same fair and unprejudiced treatment as an individual under like circumstances." We do not impute such consequences to the rulings in question.

"[I]t is well-settled that the instructions must be considered as a whole." *Territory v. Adelmeyer, supra,* 45 Haw. at 156, 363 P.2d at 986. And a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given. *State v. Heirs of Kapahi, supra,* 48 Haw. at 108, 395 P.2d at 937. Applying the foregoing precepts to the pertinent facts, we conclude no error was committed. In our opinion, the instruction on just compensation was more than adequate. On the other question, we note an instruction that the jury should "weigh and consider the

evidence without favoritism for or prejudice against either party" was given. Since both plaintiff and defendant are corporate entities and neither made a special point of such status during trial, we do not observe possible prejudice from a refusal of IASCO's requested instruction that a corporate defendant is entitled "to the same fair and unprejudiced treatment."

## B.

IASCO then maintains the trial court erred by rejecting Defendant's Instruction Nos. 10, 18, 32, 33, 34, and 35, which covered "highest and best use" (No. 10) and "condemnation blight" (Nos. 10, 18, 32, 33, 34, and 35). We again are unable to ascribe prejudicial effect to the rulings in question when we consider them within the relevant context.

The subject property was zoned primarily for apartment use, and the parties apparently acknowledged the permitted use was the "highest and best use" of the land for neither contended otherwise. Under such circumstances, a specific instruction covering the "highest and best use" was superfluous. It even might have confused, rather than guided, the jury.

IASCO argues the trial court erroneously refused all six instructions "dealing with the City's pre-condemnation efforts to depress the market price" of its land. But after reading and attempting to reconcile the six proposed instructions, we are left with a conviction that it would have constituted error for the trial court to have given them. A trial court should exercise caution not to single out and unduly emphasize one aspect of the purported evidence, for this "puts the court in the position of making an argument to the jury, and misleads the jury into thinking that because the court has specifically mentioned certain testimonial facts they are of undue importance or that the court believed them to be true." *Collins v. Shishido,* 48 Haw. 411, 418, 405 P.2d 323, 328 (1965), *quoting Powell v. Bartmess,* 139 Cal. App. 2d 394, 404, 294 P.2d 150, 156 (1956). Furthermore, the requested instructions suffered from other vices; they were cumulative and somewhat suggestive.[20]

---

[20] For example, Defendant's Instruction No. 33 read:
Implicit in the constitutional requirement of just compensation is the premise that the condemnor may not bootstrap itself to a lower value for taken property.

Reading the instructions as a whole, as we must, *Territory v. Adelmeyer, supra,* we believe this aspect of the case and the law was brought home to the jury by other instructions, including Defendant's Instruction No. 4 that defined "fair market value." It also would be safe to assume IASCO did not forego the opportunity to forcefully argue to the jury that the condemnation had a depressing effect on the market price and that the City argued with equal force to the contrary. We are unable to ascribe prejudicial effect to the trial court's rejection of IASCO's Instruction Nos. 10, 18, 32, 33, 34, and 35.

## C.

IASCO's final argument is that the trial court erred in refusing Defendant's Instruction No. 36 on the improper use of quotient verdicts. A comparison of the instruction given the jury on the matter and IASCO's proposal leads us to conclude the jury was adequately guided and the court did not abuse its discretion in giving the City's Instruction No. 17.

The City proposed a simple and straightforward instruction covering quotient verdicts. In contrast, IASCO requested a lengthy instruction we believe a layman might have experienced difficulty in comprehending. We cannot deem the trial court's selection of the simpler instruction an abuse of discretion.

Affirmed.

*John A. Hoskins (Howard K. Hoddick* with him on the briefs, *Hoddick, Reinwald, O'Connor & Marrack,* of counsel) for defendant-appellant.

*George I. Hieda,* Deputy Corporation Counsel, for plaintiff-appellee.